[Crim. No. 9638.   In Bank.   Feb. 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CALVIN
THOMAS, Defendant and Appellant.

Carlyle J. Mills, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment entered pursuant to jury verdicts finding defendant guilty of arson and first degree murder, and fixing the penalty for the latter at death.

Defendant principally complains of the introduction in evidence of an incriminating statement he made to the police after warnings as to his constitutional rights which complied with *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. ■ He contends the admonitions were inadequate under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] ; but that decision does not govern the present case, which was tried prior to June 13, 1966. (*People* v. *Rollins* (1967) *ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

Defendant was charged by information with one count of murder and one count of arson. He entered pleas of not guilty, and the matter went to trial.

Fire department personnel testified that shortly after

11 p.m. on October 19, 1964, an explosion and fire occurred in a small bedroom in the rear of Mrs. Elizabeth Ector's house, occupied by her three-year-old son Robert. When the first fire officer arrived on the scene a few minutes later, the room had been "totally engulfed" by fire and the heat was "tremendous." The officer went outside to break windows for the purpose of ventilating the house, and in so doing discovered that the window to the burning room had already been broken.

After the fire was extinguished Robert's body was found inside the room, lying against the wall underneath the window. The autopsy surgeon testified that death was due to burns and asphyxiation, and that the child "did not die instantly, but survived for some time during the heat of the fire. . . ."

Further examination of the burned room disclosed evidence establishing that a "Molotov cocktail" was the cause of the fire. Pieces of a broken wine bottle were found on the floor, beneath a splatter mark on the wall that faced the window. A smell of gasoline was detected inside the pieces of bottle and elsewhere in the room. The burn pattern on the walls and on the child's body was shallow and even, indicating the fire had spread rapidly. There was only slight fire damage to the wall containing the broken window. On the basis of these observations an expert arson investigator gave his opinion that a gasoline-filled bottle with a lighted wick had been hurled through the window, burst into flame when it struck the opposite wall, and engulfed the room in a sudden, deadly conflagration.

Mrs. Ector testified she had moved into the house on September 1, and defendant began living with her and her three children about a week later. Shortly thereafter, he helped her convert the small room into a bedroom for Robert and the other two children. As a result of various arguments and fights defendant moved out on October 17, two days before the fire, and went to live with his mother in her nearby house.

During the course of the day on October 19 Mrs. Ector, defendant, and several of their relatives and friends engaged in an incessant quarrel. Defendant's mother drew a knife on Mrs. Ector, but was disarmed. Defendant then called Mrs. Ector's mother a name, and Mrs. Ector hit him with a stick. He took it away from her and hit her several times with it. She threw hot water on him, and he kicked in her door. He

swung at her, and she hit him with a bottle. She testified he told her if he caught her outside the house he would kill her; he said he would "get even" with her and if he couldn't have her, no one else would enjoy her; and he said he would "fix her face" so that no one would want to look at it.

At 6:30 or 7 p.m. Mrs. Ector left the house with her children and some friends. They returned shortly before 11 p.m. and saw defendant standing nearby with a group of teenagers. There was no further quarreling between the parties, however. Mrs. Ector took her children inside and put Robert to bed. A few minutes later she looked out of the window and saw defendant walking from his mother's house with a bottle in his hand, in the company of another man. She lay down on her bed, then heard something hit the house, followed by the screams of her companions in the living room. She rushed out and found her son's bedroom in flames.

Mrs. Ector's testimony was corroborated by one of her companions, Freddie Johnson. In particular, Mr. Johnson testified that on returning with Mrs. Ector to her house on the evening in question he saw defendant run to the rear of the building with what looked like a wine bottle in his hand.

Cora White testified that about 9 o'clock that evening she was on her way home when she saw defendant, his sister Ruby, and two other girls walking towards a service station. She caught up with them, and saw defendant was carrying a can. At the service station the can was filled with gasoline, and defendant said he was going to "get even" with Mrs. Ector. He asked his companions to find some empty bottles for him, and a number of wine bottles were collected. The group then returned to the house of defendant's mother. Defendant placed a roasting pan on the kitchen floor, stood about eight bottles in it, filled them with gasoline, and wadded a piece of rag into the neck of each bottle. When someone shouted the police were coming, defendant hid the bottles in a trash can behind the house and covered them with a red quilted bedspread. At one point in the evening, he said he was going to throw one of the bottles into the car in which Mrs. Ector and her companions were riding. When the latter returned, the witness heard defendant say he was going to cut the telephone wires to "keep them from calling the police." She then saw defendant go to the trash can and take some bottles out. He went to the back of Mrs. Ector's house with another man, and the witness heard the sound of breaking glass, followed by screams and a blaze inside the house.

Keith Epps testified that on the evening of the crimes he saw defendant and one Rance Johnson placing into a trash can some bottles filled with gasoline and corked with rags. Later he saw them go to the back of the house; he heard a "poof" sound, and saw a fire break out. The witness then observed Rance Johnson running from the scene.

Mrs. Autry Davis, who was Mrs. Ector's mother and lived in an adjacent house, testified that on the evening in question she saw defendant picking up empty bottles from the street. After Mrs. Ector and her companions returned home, the witness saw defendant pass back and forth in front of her door. About 11 p.m. she followed him and observed him standing behind Mrs. Ector's house with another person whom she could not identify. It was her recollection that the other person handed defendant something, and defendant pulled open the screen, struck a match, lit something and threw it in the window, and a fire broke out at once. On cross-examination the witness testified that during the afternoon of that day defendant threatened Mrs. Ector, "telling her he was going to get even with her, if he have to kill one of her children."

The arson investigator testified he went to the house of defendant's mother, and upon entering smelled a strong odor of gasoline. In the kitchen he found a roasting pan, behind the house he found several empty bottles, some with rags in them, and in a nearby trash can he found a red quilted bedspread; each of the foregoing objects emitted an odor of gasoline. Defendant was arrested four days later in his mother's house; the building was dark, and defendant was discovered hiding from the police under a blanket in a bedroom closet.

The defense testimony, provided by defendant and several other witnesses, amplified on the subject of the quarreling among defendant, Mrs. Ector, and their various relatives and acquaintances, and recounted the making of various alleged threats against defendant by one or more of the foregoing. Defendant and these same witnesses, however, also corroborated the evidence of the prosecution establishing that on the evening in question defendant went to the service station with his friends and bought some gasoline, collected empty bottles on the way back, filled them with gasoline and wicks in his mother's kitchen, then hid them in a trash can; that defendant said he was going to throw a fire bomb into the car of Mrs. Ector and her companions; and that there was a discussion about cutting the telephone wires to prevent them from call-ing the police.

704

■ Defendant in effect made a judicial confession of the crimes charged. He testified on direct examination that he and Rance Johnson went to the back of Mrs. Ector's house and "I lit one of the Molotov cocktails, and Rance Johnson threw it through a window."[1] On cross-examination defendant stated he had learned how to make such fire bombs while in the service; he admitted he knew that "If you make a Molotov cocktail and throw it against something or other, the glass will break and gas will spread," causing "a tremendous fire," and that it can destroy an armored tank. He further admitted that there were no threats or provocation directed against him either when Mrs. Ector and her companions returned home at 11 p.m., or thereafter; that when the latter group had entered Mrs. Ector's house he and Rance went around to the back, carrying one of the fire bombs; and that "I knew he was going to throw it in a window." He testified, moreover, that he had helped Mrs. Ector convert the small back room into a bedroom for her three children, and knew they usually slept in it. He admitted, finally, that he ignited the bomb and did not try to stop Rance from throwing it into the children's room; that no one was threatening him and "I didn't have any feelings at that time about protecting myself"; and that when the bomb was thrown he "knew it was going to explode" and "expected there to be a fire. . . ."

The trial took place in April and May 1965, i.e., after the decisions in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) *supra*, 62 Cal.2d 338, but before *Miranda* v. *Arizona* (1966) *supra*, 384 U.S. 436, and *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]. During the course of the prosecution's case in chief, Police Officer Terry testified to the contents of two statements made by defendant shortly after his arrest. The first and principal statement took place on the evening defendant was apprehended and continued past midnight. Its contents were virtually identical with the testimony subsequently given by defendant on the witness stand. ■ Defendant contends the admission of this statement was error under *Escobedo* and *Dorado*. The record establishes, however, that prior to making the statement defendant was fully advised of his constitutional rights under those decisions: Officer Terry testified he informed defendant "that he had the right to an attorney, that he had the right to

---

[1]The police unsuccessfully sought to locate Rance Johnson. He died before being apprehended.

remain silent, and that anything he said might be used against him at some future date in court.'' The officer then asked defendant if ''he would like to tell me his side of the story,'' and defendant gave his statement freely and voluntarily. Such a warning was adequate to comply with the mandate of *Escobedo* as we construed that decision in *Dorado.* (See *People* v. *La Vergne* (1966) 64 Cal.2d 265, 270 [49 Cal.Rptr. 557, 411 P.2d 309]; *People* v. *Luker* (1965) 63 Cal.2d 464, 473 [47 Cal.Rptr. 209, 407 P.2d 9].)[2]

There is no merit in defendant's further contention that the admonition was inadequate in assertedly failing to specify that these constitutional rights were in immediate effect; that fact was obvious from the careful wording of the warning used, i.e., that defendant had the right to counsel and to remain silent but that anything he said ''might be used against him at some *future* date in court.'' Nor is defendant correct in urging an insufficient showing that at the time of the statement he knew the fire had caused anyone's death; defendant was arrested in the immediate vicinity of the fire some four days after the event, and Officer Terry testified his conversations with defendant pertained to ''the charges in this case.'' ■ Finally, defendant contends Officer Terry should not have been allowed to relate the contents of his statement without a prior *voir dire* examination to determine its admissibility (see *People* v. *Schader* (1965) 62 Cal.2d 716, 727-728 [44 Cal.Rptr. 193, 401 P.2d 665]); but defense counsel, who had previously listened to a tape recording of the statement, made no request to *voir dire* the witness, and the court was not compelled to inquire further in the light of Officer Terry's testimony establishing compliance with the *Escobedo-Dorado* rule.

■ By supplemental brief defendant contends his statement was inadmissible under the standards prescribed in *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436. However, in *People* v. *Rollins* (1967) *supra, ante,* p. 681, we held that cases which went to trial before the filing date of the *Miranda* opinion (June 13, 1966) are to be governed by *Escobedo* and *Dorado.* This is such a case.

---

[2]Defendant's second statement, given the following afternoon, was characterized by Officer Terry as ''mostly the identification of Rance Johnson, plus a boiled down, short, concise restatement of what he had told me the night before.'' The officer's brief summarizing of that statement ''added nothing to the case against defendant.'' (*People* v. *Robinson* (1965) 62 Cal.2d 889, 897 [44 Cal.Rptr. 762, 402 P.2d 834].)

■ Defendant's remaining contentions are lacking in merit. First, it is argued that the enactment of Penal Code section 190.1, providing for a bifurcated trial in murder cases, makes it a denial of due process to exclude from sitting on the guilt phase those prospective jurors who have a conscientious opinion against imposing the death penalty. The same contention has recently been rejected by us (*People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222], and *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365]), and defendant presents no grounds not heretofore considered. A review of the record convinces us there is no substance in defendant's further complaint that the questioning by the prosecutor on this issue somehow resulted in the choosing of jurors who were "committed" to vindicate themselves by imposing the death penalty or were "predisposed" to assume defendant's guilt. (See *People* v. *Pike* (1962) 58 Cal.2d 70, 85-88 [22 Cal.Rptr. 664, 372 P.2d 656], and cases cited.)

■ Defendant contends it was prejudicial error to introduce into evidence People's exhibit 10, an assertedly inflammatory photograph of the body of the victim. The matter was fully argued to the trial court, however. The prosecutor explained that it was the only photograph of the victim he intended to introduce; that it showed the position and condition of the body when the arson investigators arrived on the scene, and supported their expert testimony on the important question of the origin and nature of the fire. The court ruled that its probative value outweighed any prejudicial effect it might have, and no abuse of discretion in this respect is shown. (*People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65], and cases cited.)

■ Defendant next contends there was inadequate proof at the penalty phase of his prior federal conviction of forging and cashing a United States Treasury check. But the prosecution introduced a certified record of the federal correctional institution at Terminal Island establishing the fact of that conviction, and such a document constitutes prima facie proof under the terms of Penal Code section 969b. Defendant argues that the prison record did not inform the jury of the elements of the crime; but in his own testimony on the penalty phase defendant explained the facts underlying the prior conviction, and any further clarification could have been made at that time.

■ A charge of misconduct is predicated on the prosecu-

tor's characterization of defendant, in his argument to the jury on the penalty phase, as "a regular smart aleck." Defendant points to frequent minor disagreements between the prosecutor and himself, on cross-examination, as to the precise words defendant used on direct examination; but these difficulties simply reflected the prosecutor's effort to summarize that testimony for the purpose of cross-examination, and defendant's more accurate memory of his own language. The characterization of defendant as a "smart aleck" was based on quite distinct testimony,[3] and was well within the permissible bounds of the prosecutor's right to remark on the manner in which a witness testified. (*People* v. *Lamb* (1962) 204 Cal.App.2d 255, 266 [22 Cal.Rptr. 284]; *People* v. *Mason* (1960) 184 Cal.App.2d 317, 364 [7 Cal.Rptr. 627].)

Equally without support in the record is defendant's assertion that the deputy public defender displayed such a lack of diligence and competence as to reduce the trial to a farce or a sham. Defendant claims his counsel adopted a theory of defense which had no chance of success; but defendant fails to suggest how the case could otherwise have been tried in the light of the prosecution's substantial evidence that he was guilty of arson and felony murder.

---

[3]The prosecutor, on cross-examination, was reviewing defendant's direct testimony that after returning from the service station he made some "Molotov cocktails" at his mother's house, when the following colloquy occurred:

"Q And did you proceed to fill up the bottles that had been collected, some by you and some by the girls, in the bathroom of your mother's house? A I proceeded to make Molotov cocktails. You don't fill up bottles.

"Q All right. Tell me how you made these Molotov cocktails, please. A Taken a glass bottle, fill it one-half to three-fourths of gasoline, putting a rag in there with a string coming out the top, and packing it."

Later in the cross-examination defendant again "corrected" the prosecutor on a trivial detail:

"Q . . . You went back behind Elizabeth's house; you lit a match; is that right? A No, sir.

"Q Who lit the match? A I lit the Molotov cocktail with a cigarette lighter.

"Q All right. You lit the Molotov cocktail with a cigarette lighter? A Yes."

These incidents were justifiably commented on by the prosecutor as tending to show defendant's lack of remorse: "His attitude, 'No, Mr. Pachtman [the deputy district attorney], you don't fill a bottle all the way in making a Molotov cocktail.' How flippant can you get? He burned a child alive, and he is going to teach me how to make a Molotov cocktail, as if I give a darn. 'No, Mr. Pachtman, I didn't light the bottle with a match. I used a cigarette lighter.' That is pretty flippant. He murdered a child in that gruesome way, and all he can think of doing is acting flippant, carefree and completely unconcerned."

Defendant's remaining complaints of inadequate representation refer either to trial tactics within the discretion and judgment of counsel, or to asserted failures to object to introduction of evidence which we have herein found to be admissible. The deputy public defender assigned to this case was an experienced trial attorney, and conducted an active and searching defense. The record bears out the appropriateness of the trial court's remark to defendant that "You have able and qualified counsel and he will conduct a very good trial in your behalf." (Cf. *People* v. *Hughes* (1961) 57 Cal.2d 89, 99-100 [17 Cal.Rptr. 617, 367 P.2d 33].)

There is no merit in defendant's contention that the death penalty constitutes cruel and unusual punishment either in the abstract (*People* v. *Bashor* (1957) 48 Cal.2d 763, 765 [312 P.2d 255]) or as applied to the facts of this case (see *People* v. *Reeves* (1966) 64 Cal.2d 766, 777 [51 Cal.Rptr. 691, 415 P.2d 35]).

Finally, at oral argument defendant contended that the witness, Mrs. Autry Davis, was unsworn because she nodded rather than giving an audible response to the oath administered by the court clerk. Code of Civil Procedure section 2094 provides simply that a witness is sworn by "expressing his assent" when the oath is read to him. While it is doubtless better practice for the witness to voice his reply, in certain circumstances a deliberate nod may be equally expressive of assent. Here the record indicates that Mrs. Davis had some difficulty with her speech, and she responded in this same manner to a number of the questions thereafter put to her by counsel. In any event, if defendant was unsatisfied with the adequacy of the oath-taking, he should have called the matter to the attention of the court. Any shortcomings in the procedure were waived both by failure to object and by taking the witness on cross-examination. (*Estate of Wilson* (1953) 116 Cal.App.2d 523, 526 [253 P.2d 1011]; *Tennant* v. *Civil Service Com.* (1946) 77 Cal. App.2d 489, 498 [175 P.2d 568]; *People* v. *Duffy* (1930) 110 Cal.App. 631, 635-636 [294 P. 496].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied March 8, 1967.