[Crim. No. 13424.   Second Dist., Div. Five.   May 9, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN B. HAEBERLIN III, Defendant and Appellant.

---

Cooper & Nelsen and Thomas P. Breslin II for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Larry Ball, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J.—Defendant John B. Haeberlin III was charged along with his codefendants, Peter Fonda, Stephen Alsberg, and John R. Robischon, with illegal possession of marijuana (Health & Saf. Code, § 11530) on or about June 8, 1966. Trial was set for November 3, 1966, but continued to November 29, 1966, upon defendants' motion that an essential witness was unavailable. The case went to trial before a jury on the latter date. On December 19, 1966, the jury returned verdicts finding defendant Haeberlin guilty, codefendant Alsberg not guilty, and reported inability to reach a verdict as to either of the other two codefendants, Fonda and Robischon. Imposition of sentence was suspended and Haeberlin was granted probation for a period of four years upon certain stated conditions, one being that he spend the first 90 days in the county jail. He appeals from the order granting probation (judgment and sentence) and is on bail pending disposition of this appeal.

He contends that the prosecution's use of the testimony of a witness, missing at time of trial, given at the preliminary hearing constituted error because: (1) the witness was not properly sworn at the preliminary hearing, and (2) the People failed to exercise due diligence to obtain the witness' attendance at the trial. Finally, he contends that the witness was an accomplice and that her testimony was not sufficiently corroborated.

We have concluded that there was no error and that the order granting probation (judgment) should be affirmed.

### The Facts[1]

On June 7, 1966, the Narcotic Division, Valley Detail, of the Los Angeles Police Department received an anonymous telephone call that marijuana plants were being cultivated next door at 5180 Avenida Hacienda (hereafter "5180") in the Tarzana area of Los Angeles. The following evening, about 7:30 p.m., the officers (Sergeants Olsen, Trotsky, and Detective Walsh) went to the area and found 5180 to be a

---

[1]Only those facts necessary for determination of the points raised on this appeal will be set forth.

corner lot. They went to 5172 Avenida Hacienda which was next door to and on slightly higher ground than 5180. They advised the apparent owners of 5172 of the previous night's phone call and obtained permission to enter their back yard to observe the back yard area of 5180. Sergeant Olsen observed marijuana plants growing in the area behind the garage on the 5180 property. The officers discussed the plants with the neighbor, Mr. Beighley and his wife. Mrs. Beighley stated that she had seen the plants being watered. She stated that she had observed some young men, who appeared to live next door, carry the plants in pots to the rear yard when they moved their personal belongings into the house. It was stipulated that Sergeant Olsen was an expert in the knowledge of and familiarity with marijuana and marijuana plants. He formed the opinion that the plants growing in the backyard of 5180 Avenida Hacienda were of the genus cannabis sativa, commonly known as marijuana or Indian hemp. The officers proceeded to 5180 to make arrests for the illegal cultivation of marijuana.

Two officers (Trotsky and Walsh) went to the front door, which was opened by a Marilyn Caskey. The officers identified themselves and stated that there was marijuana growing on the premises. Sergeant Olsen (who had gone to the rear door) observed Marilyn Caskey turn and come back towards the rear of the residence, where he was standing. Then he heard her speak on the telephone saying, ''The cops are here.'' At this time, he believed this to be a prelude to the destruction of evidence, so he entered through the kitchen and took the phone from Caskey's hand and hung it up. A cellophane package of marijuana was lying in plain view in an open purse on an ironing board next to where Marilyn Caskey, Sergeant Trotsky, and Sergeant Olsen were standing. After she was informed of her rights, she was placed under arrest as she had stated that the purse was hers. She said that she had been at the premises seven to ten days, visiting at the location until ''she could get on her feet.'' At the time of arrest, the premises at 5180 were leased to defendant. At the trial, portions of the testimony which Marilyn Caskey had given at the defendants' preliminary hearing were read into evidence : She was visiting at 5180, having arrived there on the afternoon of June 1, 1966. Defendant Haeberlin was present at that time. She identified him. She stayed there temporarily and was there on June 8, 1966. Following June 1st, she had stayed overnight at 5180 except for two nights. When she stayed

overnight, defendant was one of those who also stayed overnight at the residence. While there, she had smoked cigarettes in the presence of the four defendants. At times, she supplied her own. At other times, defendants supplied the cigarettes. Some of the cigarettes she smoked at the residence "got her high." The effect was different from smoking standard brand cigarettes. The cigarettes were rolled in paper and "capped" at one end. The appearance of the material inside the cigarettes was green, like oregano. She saw defendant Haeberlin smoke this type of cigarette more than once on the premises. Defendant Haeberlin also rolled these cigarettes in her presence. She did not observe any of the other codefendants roll any in her presence. The witness had been alone in the house for approximately 45 minutes prior to her arrest.

Other facts will be detailed where relevant to the issue under discussion.

### Witness Properly Sworn

Defendant contends that witness Caskey's testimony should not have been received, because she had not been properly sworn in compliance with section 710 of the Evidence Code, which provides: "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law."

A search warrant apparently had been obtained after Caskey's arrest. Preceding the preliminary hearing proper, but before the same magistrate, defendants had made a motion under sections 1539 and 1540 of the Penal Code to quash the warrant and for return of the property seized under the warrant. For this purpose, Caskey was called as a defense witness.

The reporter's transcript of the preliminary hearing reflects the following:

"THE COURT: Call Miss Caskey . . . .

"MISS CASKEY: Yes.

"THE COURT: All right, will you step around, please. . . .

"THE COURT: Swear the witness."

"MARILYN CASKEY

was called as a witness by and on behalf of the defendants and, having been first duly sworn, was examined and testified as follows:

"THE CLERK: Will you state your name for the record, please?

"THE WITNESS: Marilyn Caskey . . . ."

After the motions of the defendants under sections 1539 and 1540 of the Penal Code were denied, the preliminary hearing proper was immediately commenced. The reporter's transcript reports the calling of the witness Caskey as follows:
"MARILYN CASKEY
was called as a witness by and on behalf of the People, and, having been previously sworn, was examined and testified as follows:
"THE CLERK: You have been sworn. Will you state your name for the record once again?
"THE WITNESS: Marilyn Caskey."
For all intents and purposes, the hearing was one continuous session conducted at one sitting. The purpose of administering an oath is to make the witness aware that he is testifying under the sanction of an oath. Here the witness was reminded that she had been sworn and impliedly admonished that she was still under the sanction of her earlier oath. "In any event, if defendant was unsatisfied with the adequacy of the oath-taking, he should have called the matter to the attention of the court. Any shortcomings in the procedure were waived . . . by failure to object. . . ." (*People* v. *Thomas* (1967) 65 Cal.2d 698, 708 [56 Cal.Rptr. 305, 423 P.2d 233]; accord, *People* v. *Berry* (1968) 260 Cal.App.2d 649, 653 [67 Cal.Rptr. 312].) ■ The objection must be raised in the proceeding where the witness is testifying and at a time when the defect can be easily remedied. (*Estate of Wilson* (1953) 116 Cal.App. 2d 523, 526 [253 P.2d 1011]; *Estate of Da Roza* (1947) 82 Cal.App.2d 550, 556 [186 P.2d 725]; *Tennant* v. *Civil Service Com.* (1946) 77 Cal.App.2d 489, 498 [175 P.2d 568].) Advantage of the defect must be taken immediately upon the fact becoming known, otherwise it is waived. (*Trigueiro* v. *Skow* (1937) 24 Cal.App.2d 253, 256 [74 P.2d 836]; *People* v. *Duffy* (1930) 110 Cal.App. 631, 635-636 [294 P. 496].) The defect is similar to a defect in the form of a question which was not raised at the earlier proceeding. Reported testimony is not vulnerable to objection as to form when used in a later proceeding. (Evid. Code, § 1291, subd. (b) (1).) A similar rationale applies to a defect in the manner of administering the oath, if any, which was not raised at the time when it could have been easily cured.

*Good Faith Effort to Secure Absent Witness' Presence*

■ The trial of this case took place during the latter part of 1966, which was prior to the United States Supreme Court handing down *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.

2d 255, 88 S.Ct. 1318]. Portions of the testimony of the witness Marilyn Caskey given at the preliminary hearing were admitted under former section 686, subdivision 3 of the Penal Code, then in effect, upon the theory that the People had established unavailability of the witness, the witness being out of state. However, the rule in *Barber* v. *Page, supra,* "that the absence of a witness from the jurisdiction would not justify the use at trial of preliminary hearing testimony, unless the State had made a good-faith effort to secure the witness's presence" was held to be retroactive in *Berger* v. *California* (1969) 393 U.S. 314, 315 [21 L.Ed.2d 508, 510, 89 S.Ct. 540, 541]. The recent case of *People* v. *Green* (1969) 70 Cal.2d 654, 664 [75 Cal.Rptr. 782, 451 P.2d 422], did not forbid the use of preliminary hearing transcripts where necessity is shown. Our State Supreme Court speaking through Justice Mosk stated: "[N]othing we say here is intended to affect or cast doubt upon the viability or constitutionality of the long-established 'prior testimony' exception to the hearsay rule. (Evid. Code, §§ 1290-1292.) This exception, as *Barber* points out, adds the factor of necessity to the constitutional aspect of confrontation—which factor may, in appropriate cases, outweigh the lack of contemporary cross-examination."

The People's foundational evidence for the use of the transcript of the absent witness Marilyn Caskey's testimony at the preliminary hearing consisted of the following:

After Lester M. Zive, a court reporter for the Municipal Court of the Los Angeles Judicial District, had testified to the necessary foundational facts, the following portions of witness Caskeys' testimony at the preliminary hearing were read into the record:

From direct examination by the prosecution: "Q. Miss Caskey, what is your home address? A. In Detroit? Q. Yes. A. 12119 Hamilton. . . . Q. When was the last time you saw him? A. When I left Los Angeles for Detroit, right after I was arrested."

From cross-examination by a defense counsel: "Q. You returned here from Detroit, is that correct? A. Yes. Q. And did they send you a plane ticket? A. Yes. Q. You were brought by escort or on your own volition? A. My own. . . . Q. Do you intend to return to Los Angeles? A. No. Q. And if we were to subpoena you, would you return? A. If you pay for it, yes. Q. And where are you going to be? A. At my home. Q. Where is that? A. 12119 Hamilton. Q. In Detroit, Michigan? A. Hamilton Park, Michigan. It is a suburb of Detroit. Q. Is there a

phone number there? A. No. Q. With whom do you live? A. Myself. Q. Are you employed? A. Yes. Q. Where? THE WITNESS: Econocar. . . . THE WITNESS: Econocar of Detroit. . . . Q. What do you do there? A. I am a receptionist-secretary, office manager. Q. Have you lived there prior to this time? A. Yes. Q. Would you tell his Honor that you will notify the District Attorney or us where you will be— A. Yes. They know where I am at. Q.—in the event you move or leave this location? A. Yes. Q. And you will respond to a request to come here if someone pays your plane fare? A. Yes, and my accommodations. Q. You mean hotel? A. Yes. . . . Q. Do you have a family there if we cannot locate you? A. No. I am by myself. . . . Q. Where is your family? A. They disowned me. Q. Where do they live? A. Here in California. Q. Where in California? A. In Los Angeles. Q. Where in Los Angeles? A. I don't know. Q. What are their names? A. The same as mine. . . . THE WITNESS: They don't even know where I am at.''

*Patrick Walsh,* a Los Angeles police officer attached to the Van Nuys narcotic detail and an investigating officer, testified: He had met Caskey at the airport to take her to the preliminary hearing. He was present at the preliminary hearing where she testified. After she testified he took her back to the Los Angeles International Airport. Enroute to the airport, Caskey had stated that she was going back to her job for some car company in Detroit, Michigan. He placed her on a plane headed for Detroit, Michigan. She had a return ticket (to Detroit) in her possession.

*Patrick McCormick* testified: He was a deputy district attorney of Los Angeles County and was in charge of cases assigned to Department 107 of the Superior Court for the County of Los Angeles, including the instant case. His file indicated that an order for the subpoena of witnesses was issued on or about October 18, 1966. Within the week prior to October 29, 1966, he placed a phone call to the Detroit Police Department and asked for the narcotic detail. A person identifying himself as Sergeant Scott answered. He spoke to that person about Marilyn Caskey, explained that she was needed as a witness in a case to be tried in Los Angeles County, gave him the information he had as to her possible whereabouts, and asked him to locate her.

He had another conversation with the same person a day or two later, and a letter (Exhibit 15) came in response. The letter addressed to Patrick McCormick, is on the letterhead of

the Detroit Police Department, dated October 29, 1966, and signed by Vincent W. Piersante, chief of detectives. It stated:

"In reference to Marilyn Caskey 22/W wanted by you as a witness for the trial of the People vs. Peter Fonda, et al. on November 3, 1966. The location of the above subject was assigned to Det. Sgt. Walter Scott of the Narcotic Bureau.

"The manager of Econocar of Detroit, Don E. Zadnik was contacted and it was established that the subject had left this employment in the latter part of September, 1966, and her whereabouts were unknown.

"Investigation at 12119 Hamilton and the subsequently obtained addresses of 633 W. Prentis, 633 W. Forest, and 15 Tuxedo established that the subject's last known ·address was the Tuller Hotel, Park and Adams, where subject stayed from October 6 to October 22, 1966. The subject failed to leave any forwarding address. U.S. Post Office records reveal no change of address filed.

"Through investigation, two acquaintances, Martin Wilson of 633 W. Forest #12 and George Brown, engineer for Barton Malow Co., were located and both stated they had not seen the subject for over a month.

"All the Caskeys listed in the Michigan Bell Telephone directory for Detroit were contacted and the subject was not located.

"A check was made with all the main hotels in this city and the subject was not located.

"It was determined during the investigation that the subject may be in possession of an undated return plane ticket to Los Angeles.

"A check was made with the Wayne County Jail and Detroit General Hospital-Central Branch revealed that the subject had not been or was presently at either place.

"If the subject is located, this department will notify you immediately."

Prosecutor McCormick further testified that he had initiated the procedure for the issuance of a subpoena for the missing witness Caskey, but was not responsible for its actual issuance.

Upon being made a witness for the defense, he was asked whether upon the available evidence the witness could not have been prosecuted for possession of marijuana. He replied that he did not think it possible once she had taken the witness stand and testified for the People. He did not believe a

warrant of arrest would stand up where his office did not intend to prosecute.

*Robert H. Meng* testified: He was an investigator with the district attorney's office. Part of his duties was to procure the attendance of witnesses in criminal cases. He tried to locate a Marilyn Caskey, but was unsuccessful. He received a notice to subpoena the witness Caskey from Deputy District Attorney Patrick McCormick, on November 1, 1966. He was informed at the time that while the case was set for November 3, 1966, it would be continued, which should give him additional opportunities for locating the witness. After the continuance, he tried to locate the witness in Detroit, Michigan, by contacting a Sergeant Scott of the Detroit Police Department on November 14, 1966. The reasons for directing his search to Detroit were : (1) Prosecutor McCormick told him that Caskey had supposedly returned to Detroit, (2) he had read a copy of the transcript of the preliminary hearing which indicated that Caskey was returning to Detroit following the preliminary hearing, and (3) he had read Exhibit 15. He talked to Sergeant Scott, but received no new leads.

He then called a Howard Beckler, on November 14, 1966, having ascertained that he was the attorney who represented Caskey at the preliminary hearing. Attorney Beckler informed him that he had no idea of Caskey's then whereabouts; he had not talked to his client since the time of the preliminary hearing.

Thereafter, he did nothing further until November 28, 1966. The reasons for the delay were: (1) Sergeant Scott had informed him that if the Detroit police were successful in locating Caskey, he would call. (2) He did not think it prudent to contact the witness until just shortly before trial; otherwise, she might disappear and become unavailable.

On November 28, 1966, he checked the criminal and bureau records of the district attorney's office to ascertain if any other action or investigation were pending against Caskey.

On November 29, 1966, he contacted the Los Angeles Police Department and the local sheriff's office, sent a teletype to the C.I.I., inquired of the motor vehicle department, the local public assistance bureau, the registrar of voters, the Traffic Violation Index of the Los Angeles Police Department, the Los Angeles City jail and Los Angeles County jail, the coroner's office, and sent a teletype to the F.B.I. He had no reply from the F.B.I. up to the time of his completing his testimony on November 30, 1966. The information received from the other sources was negative.

On November 29, 1966, he also contacted a Captain Edmundson of the Phoenix, Arizona, sheriff's office, on the basis of information he had received from the Los Angeles police that the witness had a good friend by the name of Vince Carden, 2109 Granada, Tempe, Arizona. He received a report back from Captain Edmundson that he had sent two officers to the location, but they reported that Vince Carden no longer resided at the address and no one by the name of ''Barbara'' [*sic*] Caskey was there.

Some time prior to November 21st, he had learned that the witness sometimes used the name of Barbara Stoup. He did not communicate that fact to the Detroit police. He did check under both names at the local public assistance office, the local general hospital, the local utility companies, and called four people by the name of ''Caskey'' listed in the central telephone directory.

On cross-examination, he stated that on the basis of his investigation, he could not state at that moment whether the missing witness was in or out of the state.

*Attorney Howard E. Beckler* was called as a witness by the defense. He confirmed his conversation with Investigator Meng around November 14, 1966, and that he told Meng that he did not really know the whereabouts of Marilyn Caskey. She had told him that her parents were in Ohio. He was the attorney who obtained Caskey's release following her arrest and had obtained an understanding with the district attorney's office that his client would not be prosecuted if she appeared and testified. He had had no contact with her since the preliminary hearing.

While much of the testimony as to what Investigator Meng did locally on the 28th and 29th of November, 1966, may be discounted as falling short of the due diligence required under former section 686 of the Penal Code to locate a witness within the state, the evidence is adequate to establish that the witness was out of state at the time of trial. The finding of the trial judge upon the evidence presented that the witness was not within the state cannot be disturbed. The evidence furthermore is adequate to meet the ''good faith effort'' required by *Barber* v. *Page, supra,* and *Berger* v. *California, supra.*

The questioning of the missing witness at the preliminary hearing gave ample notice to the defendants that the witness would be leaving the jurisdiction right after the preliminary examination. They were aware of the conditions under which

former section 686 of the Penal Code would permit use of the preliminary hearing transcript. There was no negligence · in not serving a subpoena upon the witness Caskey prior to her departure from California because no trial date had yet been set. (*People* v. *Nieto* (1968) 268 Cal.App.2d 231, 238-239 [73 Cal.Rptr. 844.) Michigan had a statute (Michigan Complied Laws Annotated, § 767.80)[2] which included the substance of section 2 of the "Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings." Resort to that statutory proceeding, however, was not possible unless the witness could first be located in Michigan to be taken before a Michigan court. The People had requested the cooperation of the Detroit police, who did make a bona fide effort to locate the missing witness, without success. What more could have been done under the circumstances of this case, defendant does not demonstrate on this appeal. We, therefore, hold that necessity and good faith required by the *Barber* and *Berger* cases are established by the evidence in this case, and that the trial court committed no error in permitting portions of the transcript testimony of the missing witness Caskey given at the preliminary hearing to be read into the record.

### Corroboration of Caskey's Testimony Adequate

■ Defendant finally claims that since Caskey could have been held as an accomplice, corroboration of her testimony is not adequate. Assuming, without recognizing, Caskey to be an accomplice, we disagree. Witkin, California Evidence (2d ed. 1966) p. 1037, summarizing the rule as reviewed in *People* v. *Griffin* (1950) 98 Cal.App.2d 1, 25 [219 P.2d 519] (overruled on another point in *People* v. *Weiss* (1958) 50 Cal.2d 535, 566 [327 P.2d 527]) states in part: "The corroboration need not extend to all elements of the offense, nor to every detail in the testimony of the accomplice. It need not be strong; it is sufficient if it tends in some slight degree to implicate the defendant. It need not be direct; circumstantial evidence is sufficient if the connection of the defendant with the crime may be reasonably inferred therefrom. In brief, the corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the fact-finder that the accomplice is telling the truth."

It was stipulated that Sergeant Olsen was an expert in the

---

[2]We are indebted to Attorney General Frank J. Kelley of Michigan, who kindly called our attention to this statute.

identification of marijuana. He testified that he saw in the rear yard of 5180, "[t]hree clumps or groups staked and tied, one group approximately five foot high, being two separate plants of marijuana; the other two groups being approximately two foot in height, each consisting of several individual marijuana plants staked and tied in several locations by what appeared to be a plastic tie to a wood stake." Defendant was the lessee of the premises at 5180.

The neighbor, Mrs. Wayne Beighley, who resided at 5172 Avenida Hacienda, testified: 5180 adjoins her property. On May 8, 1966, she met defendant in the front yard of 5180 when he was watering, along with two of his codefendants. Thereafter she saw defendant around the yard at 5180 on numerous occasions between May 8 and June 8, 1966. Between May 8 and June 8, 1966, she saw defendant and another person carry a plant in an unusual container and plant it behind the carport. The plant had green slender leaves. These leaves were similar to those on the marijuana plants which were seized by the police on June 8th. Different persons residing at 5180 thereafter came out and watered it.

The foregoing testimony tends to connect the defendant with the commission of the crime, to wit, illegal possession of marijuana and that the witness Caskey was telling the truth. ■ Even circumstantial evidence, which is slight and entitled to little consideration if standing alone, is adequate for corroborative purposes. *(People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].)

*Disposition*

The judgment (order granting probation) is affirmed.

Kaus, P. J., and Stephens, J., concurred.