[No. A021335. First Dist., Div. Three. July 31, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT E. KELLY, Defendant and Appellant.

COUNSEL

Paul D. Wolf, under appointment by the Court of Appeal, and Clifford J. Baker for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eugene W. Kaster and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WHITE, P. J.—Defendant and appellant Robert E. Kelly and codefendant Maurice J. Keenan were jointly tried before a death-qualified jury in the Superior Court of the City and County of San Francisco. Each was jointly charged on six separate counts, namely, murder (Pen. Code, § 187), burglary (Pen. Code, § 459), two counts of attempted robbery (Pen. Code, §§ 664/

211), robbery (Pen. Code, § 211) and possession of a sawed-off shotgun (Pen. Code, § 12020). Enhancement allegations were also charged for firearm use (Pen. Code, §§ 12022.5, 1203.06, subd. (a)(1)). Appellant was found guilty of all charges including first degree murder under the felony-murder doctrine. Codefendant Keenan was also convicted of the six common charges but was found guilty of first degree murder under special circumstances allegations (Pen. Code, § 190.2, subds. (a)(17)(i) and (vii)), allowing for the imposition of the death penalty. Appellant was sentenced to a twenty-five years to life imprisonment term. The death penalty was imposed on codefendant Keenan.

Appellant contends on appeal that by denying his motions for severance of trial, the trial court (1) abused its discretion; (2) deprived him of a trial by a jury representing a cross-section of the community; (3) denied appellant equal protection and due process of law; and (4) led to a violation of appellant's right not to incriminate himself. Alternatively, appellant contends that the trial court erred in sentencing him to the term provided for first degree murder.

## I .

On July 8, 1979, at 9 p.m., appellant and codefendant Maurice J. Keenan entered Robert Opel's residence and art gallery in San Francisco. Present in the gallery were Opel and acquaintances Anthony Rogers and Camille O'Grady. After entering, Keenan opened a briefcase he was carrying and took out a pistol, appellant took out a sawed-off shotgun. Brandishing the weapons, first Keenan, then appellant demanded money or drugs from Opel who denied having either. Appellant then approached Rogers and O'Grady, pointed his gun at O'Grady and threatened to "blow her head off" unless they were given what they wanted.

Keenan subsequently ordered appellant to take Rogers and O'Grady to another area of the gallery with instruction to "take them out." Appellant moved the pair to the kitchen area and forced them to lie on the floor. Pointing the gun at their heads, he repeated his demand for drugs or money. Rogers surrendered $5, appellant then rifled through O'Grady's pocketbook and took Rogers' camera which lay nearby. Throughout, both O'Grady and Rogers were still able to hear Keenan and Opel arguing.

Either two or three gunshots were heard by the pair with the sound of a falling body following the last shot. Keenan then ordered appellant to "kill them both" before fleeing. Appellant did not kill them but only loosely bound their hands together with a telephone cord. Before leaving, appellant told the witnesses that if they ever identified either assailant, they would

be dead. After Keenan and appellant left, the pair untied their hands and found Opel dead on the floor of the gallery bleeding from the head.

Appellant was arrested on July 10, 1979, and gave a tape-recorded confession to the police. O'Grady and Rogers positively identified Keenan and appellant at a police lineup on July 11, 1979.

At trial, appellant testified he had accompanied Keenan on the robbery as a "backup man." He also stated that he needed money at the time of the robbery but did not anticipate any physical violence occurring. Although admitting to holding O'Grady and Rogers at gunpoint, appellant stated he assisted in the robbery because he feared reprisal from Keenan if he refused. Appellant claimed he was afraid of Keenan but was never directly threatened by him.

Testimony revealed that appellant had undergone psychiatric treatment starting at age nine or ten for emotional problems and had also attempted suicide. At age thirteen, appellant started experimenting with drugs, eventually earning money by buying and selling marijuana. For a few weeks prior to the incident, Keenan and appellant together had regularly used large amounts of methamphetamine.

Expert psychiatric testimony portrayed appellant as exhibiting a borderline personality disorder. Symptoms of the disorder include generalized inadaptability, dependency, formation of intense but short-lived relationships, poor judgment and impulsivity. One psychiatrist found consistency between appellant's personality type and participation in a crime where he genuinely feared retribution from a "commanding personality."

## II

Appellant and codefendant Keenan were jointly charged and tried on six identical counts. Appellant contends the trial court abused its discretion by denying his motions for severance. Because of an allegation of special circumstances (Pen. Code, § 190.2, subds. (a)(17)(i) and (vii)) was charged against only Keenan, appellant claims "prejudicial association" was cast upon his case by the "spectre of the death penalty" inherent in Keenan's situation.

In *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869], the California Supreme Court noted the trial court had discretion in granting or denying a motion for severance. ■ Under Penal Code section 1098, the "Legislature has decreed joint trials to be the rule and separate trials the exception." (66 Cal.2d at p. 923.) Further, the right to a separate

trial is not so fundamental that an improper denial of severance will automatically require a reversal. Instead, there must be a weighing of "the prejudicial impact of all the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial." (*Ibid.*) Reversal (of the denial) will occur only where there is shown "a reasonable probability that the [appellant] would have obtained a more favorable result at a separate trial." (*Id.*, at pp. 922-923; see also *People* v. *Ortiz* (1978) 22 Cal.3d 38, 46 [148 Cal.Rptr. 588, 583 P.2d 113].) Two major considerations are: (1) whether the separate trial would have been less prejudicial than the joint trial, and (2) whether there was clear evidence of defendant's (appellant's) guilt. (*People* v. *Massie, supra,* 66 Cal.2d at p. 921; see also *People* v. *Ortiz, supra,* 22 Cal.3d at p. 46.)

Appellant specifically claims the joint trial prejudiced him by (1) interfering with plea negotiations, (2) delaying trial, and (3) limiting his participation in jury selection. Relative to the first consideration of *Massie,* prejudice will never be presumed at the appellate level; it is incumbent upon appellants to affirmatively show they have been prejudiced by an alleged error. (*Ravel* v. *Hubbard* (1952) 112 Cal.App.2d 255, 258 [246 P.2d 88].) Further, if the purported prejudice is not evident on the face of the record, then the appellant must not only prove its existence but show that he was sufficiently prejudiced to justify reversal. (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 263 [280 P. 970]; *Buckley* v. *Chadwick* (1945) 45 Cal.2d 183, 203 [288 P.2d 12].)

Using these criteria in the instant case shows appellant failing to fulfill his burden of proving, to a reasonable probability, that the granting of a separate trial would have resulted in a decision any more favorable to his case. The prejudice alleged appears in the record only as unsubstantiated speculation on the appellant's part. In sum, neither the prejudice nor its gravity is sufficiently proven by appellant.

An examination of the second *Massie* consideration—whether there was clear evidence of defendant's guilt—similarly reveals little error in the trial court's exercise of discretion. Even without considering appellant's testimony during trial or the tape-recorded statement made prior to trial, the testimony of eyewitness O'Grady in addition to all other evidence presented at trial appears conclusive as to the identity of the appellant and his participation in the crimes. Whether separate or joint trials were held, it is hard to conceive of any different result relative to the appellant.

This court does realize that in a joint trial of a multiple number of defendants a codefendant may suffer "associational prejudice." (*People* v. *Massie, supra,* 66 Cal.2d at p. 917.) In light of the strong preference for

joint trials (under Pen. Code, § 1098) and the discretion afforded the trial court in severance motions, relief can only be granted when, in a case-by-case analysis, clear evidence showing prejudice is offered. (*People* v. *Clark* (1965) 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Eudy* (1938) 12 Cal.2d 41, 46 [82 P.2d 359].) In the instant case, however, no tangible proof of prejudice has been offered, consequently, appellant cannot prevail on this point.

## III

Appellant also argues the trial court's refusal to grant severance exposed him to a death-qualified jury, depriving him of his constitutional right to an impartial jury representative of the "full spectrum of community attitudes appropriate to [his] noncapital case[]."

The Supreme Court has consistently held that "exclusion of jurors opposed to capital punishment from the guilt trial [does] not deny the defendant a fair and impartial jury." (*People* v. *Fields* (1983) 35 Cal.3d 329, 343 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365].) While the general rule is usually stated relative to the capital defendant, this appeal deals with a noncapital defendant jointly tried with a capital defendant. There is but one case in California which addresses this particular issue. *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], dealt with two codefendants similarly situated to those in the instant case; a capital and noncapital defendant jointly tried. There, the Supreme Court held that the noncapital defendant's right to a trial by an impartial jury was not violated by his being jointly tried with the capital defendant. (*Id.*, at pp. 393-395.)

Appellant contends that the *Lara* holding should be limited in application to its factual situation. There, the denial of severance was upheld when the noncapital defendant alleged prejudice stemming from the trial court's refusal to equalize the number of peremptory challenges available to each codefendant. Such a distinction is untenable as we read *Lara* to stand for the more general and basic idea that it is not prejudicial for a noncapital codefendant to be tried by a jury which is not hostile to the death penalty.

The correctness of the trial court's denial of severance is further supported by the United States Supreme Court's decision in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]. Appellant cites *Grigsby* v. *Mabry* (8th Cir. 1985) 758 F.2d 226, to prove the existence of inherent

unfairness in the exclusion of absolute death penalty opponents from the guilt phase of a trial. The circuit court found the death penalty opponents to be a "distinctive group" (*id.,* at p. 231) which, when systematically excluded from juries, violates the cross-sectional requirement of the Sixth Amendment and is more "conviction prone than a normal criminal jury." (*Id.,* at p. 237.)

Reversing *Grigsby* in *McCree,* the United States Supreme Court held that "death-qualification" of a jury violates neither the fair cross-section requirement of the Sixth Amendment (*Lockhart* v. *McCree, supra,* at p. — [90 L.Ed.2d at p. 150]) nor the constitutional right to an impartial jury. (*Id.,* at p. — [90 L.Ed.2d at p. 150].) The court found that a group which shares attitudes on the imposition of the death penalty is not a "distinctive group" whose systematic exclusion from juries violates the Sixth Amendment. The "distinctive group" designation is more properly used relative to groups like women, Blacks and Mexican-Americans. (*Id.,* at p. — [90 L.Ed.2d at p. 149].) Additionally, the court felt the circuit court had improperly relied on insufficient evidence in determining that death penalty opponents constitute a group "more conviction prone." (*Id.,* at p. — [90 L.Ed.2d at p. 147].)

The United States Supreme Court also noted that a truly "impartial jury" exists in theory only—for practical application, a "fair and impartial" jury need only be able to "conscientiously apply the law and find the facts." (*Id.,* at p. — [90 L.Ed.2d at p. 151].)

Considering the general rule enunciated in *Fields* and *Lara,* the holding of the United States Supreme Court in *McCree* and the appellant's failure to show any prejudice suffered, we must reject appellant's assertion of a Sixth Amendment violation.

## IV

Appellant next argues the denial of severance denied him equal protection (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15.) Denial of equal protection allegedly arose from appellant's being tried as a member of a "capital defendant" class instead of the proper "noncapital defendant" class. The due process violation charges that the relevant joint trial statute (Pen. Code, § 1098) deprives one of liberty solely for the noncompelling governmental interest of convenience.

We find no merit in either claim as the joint trial provision of Penal Code section 1098 repeatedly survived challenges on both constitutional grounds. Simply put, there is no constitutional question involved in ordering a

joint trial. (See *People* v. *Lara, supra,* 67 Cal.2d at pp. 394-395; *People* v. *Dowell* (1928) 204 Cal. 109, 114-115 [266 P. 807]; *People* v. *Diaz* (1969) 276 Cal.App.2d 547, 549-550 [81 Cal.Rptr. 16]; *People* v. *Hidalgo* (1961) 195 Cal.App.2d 843, 846-847 [16 Cal.Rptr. 312]; *People* v. *England* (1934) 140 Cal.App. 310, 314-316 [35 P.2d 565].)

Appellant further contends the trial court's denial of severance caused a violation of his privilege against self-incrimination. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.) That privilege, codified in Evidence Code section 930 provides: ". . . a defendant in a criminal case has a privilege *not to be called* as a witness and not to testify." (Italics added.)

At trial, during prosecution's case-in-chief, appellant was prevented from introducing as evidence the tape-recorded statement he made to police on July 10, 1979. The court acted properly to protect codefendant Keenan under the dictates of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. Since appellant was then the only person able to lay the foundation for the recording's admission, a denial of severance is alleged to have coerced appellant to take the stand in violation of his privilege against self-incrimination.

Appellant admits the trial court did not "tell appellant that he must testify" but nevertheless requests this court to "extend the scope of coverage" of Evidence Code section 930 to situations where there is an indirect, constructive "compulsion" to testify. This we are not prepared to do as appellant offers no authority for such an extension and such action would unacceptably alter the legislative intent as evidenced by the very words of the code. The phrase ". . . not to be called . . ." clearly requires some affirmative or deliberate positive action or intent by either the court or state before a violation can be charged.

Regarding the compulsion aspect, ". . . [t]he Fifth Amendment prohibits a trial court from directly or indirectly requiring a defendant in a criminal case to give a statement disclosing any facts or information to the prosecution." (*McMullen* v. *Superior Court* (1970) 6 Cal.App.3d 224, 228-229 [85 Cal.Rptr. 729], quoting *Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213].) A disclosure will be found in violation of the privilege if it ". . . conceivably might lighten the prosecution's burden of proving its case in chief." (*Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673].) Forbidden are disclosures which could serve as a "'link in the chain' of evidence tending to establish guilt of a criminal offense." (*Ibid.*; *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr. 774, 557 P.2d 65].)

Quite simply, the record here discloses (and appellant refers to) no intent by either the state or the court to require or force the appellant to assume

any of the state's burden. A criminal defendant can voluntarily waive the self-incrimination privilege to testify and expose himself to cross-examination. (*People* v. *Ing* (1967) 65 Cal.2d 603, 610 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *James* (1976) 56 Cal.App.3d 876, 888 [128 Cal.Rptr. 733]; *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 867 [118 Cal.Rptr. 226].) Appellant's testimony can more properly be considered a "voluntary" decision involving no constitutional violation.

In *People* v. *Samuels* (1983) 147 Cal.App.3d 1108 [195 Cal.Rptr. 598], the trial court denied a motion for continuance of a probation revocation hearing until after the trial for the underlying charge. Defendant was left with the choice of either asserting his right of silence during the hearing, risking probation revocation, or, testifying at the hearing, prematurely presenting his trial defense. Upon appeal, defendant claimed the denial of the continuance motion forced him to forego his constitutional right to silence at the hearing. The court, relying on *People* v. *Jasper* (1983) 33 Cal.3d 931, 934 [191 Cal.Rptr. 648, 663 P.2d 206], found the "probationer's testimony to be *voluntary*" and could not be characterized as a "compelled disclosure." (*People* v. *Samuels, supra,* at p. 1112, italics added.)

The present case is analogous to *Samuels*; here, because of the denial of a motion for severance, appellant contends he was left with the choice of remaining silent (i.e., not offering his recorded statement as part of his defense), or "being forced" to take the stand in laying the foundation for evidence needed for his defense. We conclude, based on the similarity between the situations of the defendant here and in *Samuels,* that we are left with little choice but to likewise consider this appellant's testimony "voluntary" and not "compelled."

### V

Appellant's second major challenge claims the sentence of 25 years to life should be vacated and the case remanded for resentencing. In reliance on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], appellant claims the sentence is cruel and unusual, violative of the California Constitution, article I, section 17.

■ A sentence will be found unconstitutional if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted [105 Cal.Rptr. 217, 503 P.2d 921].) *Lynch* suggested three aids in determining proportionality: (1) an examination of the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; (2) a comparison of the challenged penalty with punishments prescribed in the same jurisdiction for other more serious offenses; and (3) a comparison of the challenged penalty with punishments

prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision. (*Id.*, at pp. 425-427.)

Application of the first inquiry requires a consideration of "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) With respect to the nature of the offender, courts must ask "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

Defendant in *Dillon* was a 17-year-old high school student who was convicted of first degree felony murder after he raided a marijuana farm with six other youths, and shot and killed an armed guard. The jury had expressed considerable reluctance to apply the felony-murder rule to the facts of the case, and the trial court reluctantly sentenced him to the mandatory life term in prison only after the Court of Appeal held that defendant was ineligible as a matter of law for Youth Authority commitment.

Despite the fact that defendant in *Dillon* shot his victim nine times, the Supreme Court held that the sentence of life imprisonment as a first degree murderer was grossly disproportionate to his individual culpability, and concluded that he should be punished as a second degree murderer. (*Id.*, at p. 489.) In its proportionality analysis, the court focused first on the youth's own explanation of the episode, which revealed the evolution of his state of mind from "youthful bravado, to uneasiness, to fear for his life, to panic." The court emphasized that although a defendant's explanation is often discounted as self-serving, both the trial judge and the jury gave defendant Dillon's testimony "large credence and substantial weight." (*Id.*, at p. 482.) The court also emphasized the uncontradicted expert testimony of a clinical psychologist that defendant was an unusually immature youth, and pointed out that he had no prior record. In addition, the court noted that both trial judge and jury believed that life imprisonment as a first degree murderer was excessive in relation to defendant's true culpability. Finally, the court compared the sentence with the "petty chastisements" handed out to the other participants in the raid, several of whom were also armed with shotguns, and all of whom were at least aiders and abettors in the killing. None of these individuals were convicted of any degree of homicide, and none was sentenced to any state prison term. (*Id.*, at p. 488.)

In contrast, in *People* v. *Laboa* (1984) 158 Cal.App.3d 115 [204 Cal.Rptr. 181], the court applied the *Dillon* analysis and concluded that a defendant's life sentence for first degree felony murder was not grossly disproportionate to his individual culpability, even though he did not fire the fatal shot, and

even though the shooting was accidental. Defendant in *Laboa* participated with several others in a nighttime robbery of an acquaintance; a codefendant accidentally shot and killed the victim; defendant was in another room at the time. Defendant was 21 years old with a prior record. The evidence established that he knowingly participated in the robbery, and that he knew stolen guns were going to be used. His punishment was similar to that received by the other participants in the crime. The appellate court acknowledged that he may have been somewhat less culpable than the other participants, but noted that there was nothing to indicate that the jury was reluctant to convict him, or that the court believed that application of the felony-murder rule was harsh under the facts of this case. (*Id.*, at p. 122; see also *People* v. *Harpool* (1984) 155 Cal.App.3d 877, 889-890 [202 Cal.Rptr. 467]; *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1014 [204 Cal.Rptr. 271].)

■ The bulk of the facts in the instant case are more similar to *Laboa* than to *Dillon.* Examining the nature of appellant at the time of the crime, appellant was 33 years old and had previously been convicted six times (twice for auto theft, twice for assault and battery and once each for burglary and possession of a concealable firearm). Additionally, he not only habitually used illegal drugs but made a livelihood through their sale to others.

Factually, this case is strikingly similar to *Laboa*; appellant knowingly participated in the armed robbery, the codefendant (Keenan) actually shot and killed the victim while appellant was in another part of the premises, and both appellant and codefendant have received serious sentences unlike the disparity of sentencing in *Dillon.*

Appellant argues that there was some juror concern about the "degrees of culpability and about application of the felony-murder rule." The appellant's jury did indeed twice request further instruction from the court regarding the technical difference between first and second degree murder and the felony-murder rule. There is no proof, however, that the bases of this jury's requests were parallel to the *Dillon* jury's evident reluctance to apply the felony-murder rule to that case or that jury's plea to the court to commit Dillon to the Youth Authority rather than to the state prison. (*People* v. *Dillon, supra,* at p. 485.) The requests for further court guidance in this case can more realistically be construed as a conscientious attempt by the jury to better fulfill its duty through a proper understanding of the relevant law.

Appellant further argues *Dillon* is applicable since the circumstances show him a similarly situated defendant; that because of the effects of drug use, his long-standing emotional disturbance and his fear of his codefendant Keenan, his state of mind at the time and lesser degree of culpability do

not warrant first degree felony-murder punishment. We disagree, for even if this court were to accept these contentions as true, the record nevertheless exhibits sufficient culpability which does not render a first degree felony-murder sentence "grossly disproportionate." Appellant chose to assist and did fully participate in the armed robbery for (at least) the partial purpose of obtaining money, he independently decided to disobey Keenan in not killing the witnesses but did freely choose to warn them against identifying either perpetrator. Considering the deliberate nature of appellant's acts, in conjunction with the real factual departure from *Dillon* already noted, we cannot say the punishment here was grossly disproportionate to appellant's degree of culpability. Indeed, the lesser degree of culpability which appellant claims (as compared to codefendant Keenan) has already been addressed since only Keenan was more severely charged and convicted under the special circumstances doctrine.

Harsh as the felony-murder rule may seem to the appellant, it nevertheless is the law and *Dillon* but an exception.[1] In sum, because the punishment here was within the bounds prescribed by law and its application here does not "shock[] the conscience and offend[] fundamental notions of human dignity" (*In re Lynch, supra,* 8 Cal.3d at p. 424, fn. omitted), we find no error in the action below.

The judgment is affirmed.

Scott, J., and Barry-Deal, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 19, 1986.

---

[1] "*Dillon's* application of a proportionality analysis to reduce a first degree felony-murder conviction must be viewed as representing an exception rather than a general rule." (*People v. Munoz, supra,* 157 Cal.App.3d 999, 1014; see also *People* v. *Laboa, supra,* 158 Cal.App.3d 115, 122; *People* v. *Harpool, supra,* 155 Cal.App.3d 877, 889-890.)