Filed 3/14/16  P. v. Trujillo CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FREDDY ANGEL TRUJILLO,<br><br>    Defendant and Appellant. | B259572<br><br>(Los Angeles County<br>Super. Ct. No. PA072515) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Freddy Angel Trujillo appeals from his judgment of conviction of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664) and other counts with true findings on gang enhancement allegations (§ 186.22, subd. (b)(1)). On appeal, Trujillo contends that the trial court committed reversible error in revoking his right of self-representation and in admitting certain witness testimony at trial. Trujillo also claims that the evidence was insufficient to support his convictions for false imprisonment, second degree robbery, and criminal threats, and the gang enhancement findings. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

In a second amended information, the Los Angeles County District Attorney charged Trujillo with the following: (1) attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664) [count 1]; (2) carrying a loaded firearm in public (§ 25850, subd. (a)) [count 2]; (3) possession of a firearm by a felon (§ 29800, subd. (a)(1) [count 3]; (4) false imprisonment by violence (§ 236) [count 4]; (5) second degree robbery (§ 211) [count 5]; (6) criminal threats (§ 422, subd. (a)) [count 6]; (7) dissuading a witness by force or threat (§ 136.1, subd. (c)(1)) [count 7]; (8) dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)) [count 8]; (9) corporal injury to a child's parent (§ 273.5, subd. (a)) [count 10]; (10) resisting a peace officer (§ 148, subd. (a)(1)) [counts 11, 13]; and (11) attempted second degree robbery (§§ 211, 664) [count 14].[2] As to count 1, it was alleged that Trujillo personally discharged a firearm (§ 12022.53, subds. (b)-(d)) and inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the offense. As to counts 1, 2, and 3, it was alleged that Trujillo committed each offense for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

[2] The second amended information did not contain a count 9 or a count 12.

members (§ 186.22, subd. (b)(1)).  It also was alleged that Trujillo had served five prior prison terms within the meaning of section 667.5, subdivision (b).

## II.  The Evidence At Trial

### A.  January 7, 2012 – Crime Against Louise Day [Count 10]

Louise Day had a romantic relationship with Trujillo from 2006 to 2009.  On January 7, 2012, Trujillo went to Day's residence to visit their young daughter.  During the visit, Trujillo and Day argued.  Trujillo then hit Day three times with his fist on the side of her head and face.  Day did not initially report the incident to the police because she was afraid of Trujillo.  He had hit her multiple times in the past, and she feared he would take their daughter from her.  Day also believed that Trujillo was a gang member because he had "Newhall 13" gang tattoos and went by the moniker, "Temper."  After the incident, Day and her daughter moved out of the home and began staying elsewhere because she feared for their safety.

### B.  January 12, 2013 – Crimes Against Jaime Martinez [Counts 1, 2, 3]

Jamie Martinez and Monique Elias began dating in November 2011.  On January 12, 2012, at around 7:00 p.m., Martinez and Elias were in front of his house in Newhall, California.  Elias was sitting in the back of Martinez's parked truck, and he was standing beside her.  They began arguing, and Martinez told Elias he wanted to break up with her.  As their argument continued, Elias became aggressive and threatening.  At one point, Trujillo, whose gang moniker was "Temper," walked by, and Elias yelled out to him in a loud voice, "Temper, Temper."  Trujillo did not respond, and instead continued walking across the street without looking at either Elias or Martinez.  Martinez nevertheless was afraid because Elias had told him in the past that Trujillo was a member of the Newhall 13 gang and a violent person.  Martinez also believed that Elias was associated with the Newhall 13 gang because she would hang out with its members.  Martinez, who had no gang affiliation, decided to leave the area to avoid any trouble with Trujillo.  Martinez yelled at Elias to get out of his truck, and as soon as she did, he drove away.

A short time later, Martinez received a call from his friend, Juan Navarro, who asked him for a ride. Navarro also was a member of the Newhall 13 gang. After picking up Navarro and his girlfriend, Martinez drove them to Navarro's house in Newhall. At about 9:00 p.m., Martinez parked his truck on the street in front of the house, and Navarro's girlfriend went inside. Martinez and Navarro stayed outside where they talked for 10 to 20 minutes. As they were standing on the driveway, Martinez saw Trujillo walking toward them. Due to the earlier argument with Elias, Martinez became afraid and decided to leave. Martinez walked to his truck and got inside, passing Trujillo on the sidewalk. Trujillo continued walking toward Navarro's house, and Navarro said, "He's cool." Trujillo then turned around and began walking back toward Martinez. As Martinez sat in his truck preparing to leave, Trujillo again walked past him and stopped near the rear bumper of the truck. A second later, Martinez heard a loud noise, felt a sudden pain in the back of his head, and realized he had been shot. At the time of the shooting, Martinez did not see anyone else on the street other than Trujillo.

Martinez drove about a mile to his friends' house for help. One of his friends asked who had shot him, and Martinez answered that it was Temper. After the police and paramedics arrived, Martinez was taken to the hospital with a gunshot wound to the back of his head. The bullet remained lodged in his head and could not be removed. On the night of the shooting, Martinez told officers at the hospital that he did not know who had shot him. However, two days later, on January 14, 2012, Martinez identified Trujillo as the shooter in a six-pack photographic lineup. He again identified Trujillo as the shooter at a November 2012 preliminary hearing.

Trujillo's ex-girlfriend, Day, was present in the Newhall area at the time of the shooting. She had driven Trujillo to a location near Navarro's house. After Day parked her car on the street, Trujillo got out and said he was going to get money for gas. He took the keys to the car and began walking in the direction of Navarro's house. Day sent a text message to Navarro to let him know that Trujillo was headed there. About five minutes after Trujillo left, Day heard several popping noises that sounded like gunfire. Trujillo returned to the car a minute later and yelled at Day to drive. Day drove her car

4

away from the scene and asked Trujillo what had happened as she pulled into a nearby gas station. Trujillo shouted, "I said drive, bitch," and grabbed the steering wheel so that Day would not stop. Day then began driving to her house, but her car ran out of gas, and she walked the rest of the way home with Trujillo following her. At one point, Trujillo stopped on the sidewalk and appeared to reach into some nearby bushes. When Trujillo arrived at Day's house a short time later, he was pacing around and acting paranoid. Later that night, Navarro called Day and told her, "That's fucked up, what Fred did." A few days after the shooting, Navarro visited Day in person and warned her that "Fred was on a good one and to get the fuck out of [her] house before he does something to [her]." Navarro was shaking as he spoke to Day and appeared to be scared.

On January 19, 2012, Los Angeles County Sheriff's Detectives Adam Dorman and Jeffrey Burrow interviewed Navarro while he was in custody on an unrelated charge. Navarro told the detectives that he was friends with Martinez and that Martinez had given him a ride to his mother's house in Newhall. Navarro said that, as he and Martinez were talking in the driveway, a man approached, argued with Martinez, and then shot at Martinez as he was driving away in his truck. When asked to identify the shooter, Navarro initially answered, "You know I can't say." He also told the detectives several times, "You know who the shooter is." After Detective Dorman described the severity of Martinez's head injury, Navarro stated, "I don't know why Temper shot him. It's fucked up, what he did. That fucker is crazy." At various times in the interview, Navarro also referred to Temper as "Fred." When asked about a motive for the shooting, Navarro stated that Martinez had a "bad breakup" with Elias, who was affiliated with Newhall 13, and that Elias "probably made up some story and told it to Fred to get him involved."

**C.    January 23, 2012 – Crimes Against Paige Kirk [Counts 4 through 8, 14]**

In January 2012, Paige Kirk met Trujillo through a mutual friend. Kirk believed that Trujillo was a member of a Newhall gang based on his gang tattoos. She had also heard Trujillo referred to as Temper. On January 23, 2012, at about 1:00 a.m., Trujillo called Kirk and asked her for a ride. Kirk agreed and drove her car to a house in Santa

5

Clarita, California. Trujillo came outside of the house with two women whom Kirk had not met before. One of the women was carrying a blade and made a comment to Kirk about slashing the tires on her car. Trujillo and one of the women, who identified herself as Maria, then got into the car. Maria told Kirk to drive to Newhall. Kirk complied because she felt threatened by the women's approach with a weapon. As Kirk was driving, she heard Trujillo and Maria discussing narcotics.

Kirk drove Trujillo and Maria to multiple locations. Maria stayed with Kirk wherever they went. After several stops, Kirk drove them back to the house in Santa Clarita. Maria then took Kirk's cell phone and went inside the house. The other woman told Kirk that she was not getting her cell phone back. Kirk was afraid because of the weapon that she had seen earlier and felt that she had no choice but to relinquish her cell phone to the women.

Trujillo then told Kirk to drive him to additional locations. Kirk continued to feel afraid because she did not know "who ended up with the blade." As Kirk was driving, she repeatedly told Trujillo to get out of the car so that she could return home, but he refused. At some point, Trujillo became infuriated with Kirk. When Kirk stopped at a location in Newhall, Trujillo took her car keys from the ignition. As Kirk struggled with Trujillo to retrieve her keys, she started crying. She felt overwhelmed by the situation and scared of what Trujillo might do to her.

Following a struggle, Kirk was able to recover her keys. Trujillo then opened her glove compartment and took her vehicle registration document. Trujillo told Kirk, "This is for my protection, so I know where you live." He also told her, "If you tell anyone about tonight, I know where you live." Based on these statements, Kirk was afraid that Trujillo might come after her, and that contacting the police could put her and her family in jeopardy. Shortly after Kirk returned home, however, her mother reported the incident to the police. During an interview with the police a few hours later, Kirk seemed frightened and visibly shaken. At the November 2012 preliminary hearing, Kirk testified that she still was in fear of Trujillo.

6

**D.      January 25, 2012 – Crimes Against Arresting Officers [Counts 11, 13]**

On January 25, 2012, Los Angeles County Deputy Sheriffs Joseph Crilly and Jeffrey Brito were part of a surveillance team searching for Trujillo. At about 9:00 p.m., they conducted a traffic stop of a brown van. Trujillo was in the back seat of the van. Once outside the vehicle, Trujillo initially complied with Deputy Crilly's order to place his hands behind his back. However, as Deputy Crilly was attempting to handcuff him, Trujillo pulled out of the deputy's grip and ran down the freeway onramp. Deputies Crilly and Brito chased Trujillo on foot and tackled him. Trujillo continued to resist for a period of time before being subdued and handcuffed. During a search of Trujillo, Deputy Crilly found a vehicle registration document in the names of Stephen and Monica Kirk in Trujillo's front pants pocket.

**E.      The Gang Expert Testimony**

Detective Dorman testified as a gang expert for the prosecution. According to the detective, Newhall 13 was a criminal street gang with approximately 150 members as of 2012. The geographic territory claimed by the gang included the area where Martinez had been shot. The primary activities of the gang included vandalism, robbery, assault, kidnapping, false imprisonment, attempted murder, firearm possession, and narcotics sales. Trujillo, whose gang moniker was "Temper," was a self-admitted member of Newhall 13 and had visible gang tattoos on his head and neck. Detective Dorman believed Trujillo acted as an enforcer for the gang because Trujillo had weapons in his possession during prior police contacts and other gang members had made statements to the effect that "you don't mess with him" and "you don't get in his way" in describing Trujillo. Navarro also was an active member of Newhall 13 and had numerous gang tattoos. Detective Dorman opined that Elias was an associate of Newhall 13 based on her history of socializing with members of the gang at known gang hangouts. Elias also had a history of engaging in sexual relations with multiple Newhall 13 members. Detective Dorman believed Newhall 13 would have had a sense of loyalty to Elias because she had been a close associate of the gang for some time.

Detective Dorman testified that loyalty and respect were important aspects of gang culture, and that gang members showed their loyalty and gained respect within the gang by committing acts of violence. The commission of violent crimes also served to instill fear in the community and allowed the gang to operate its business with impunity because residents were often reluctant to report gang crimes. Detective Dorman opined that an act of disrespect against a gang associate could be perceived as an act of disrespect against the entire gang. He further opined that a gang would benefit from punishing such acts because the lack of a response would make the gang appear weak to both residents and rival gangs and lessen its overall power. In addition, Detective Dorman opined that a gang enforcer might feel obligated to punish an act of disrespect committed in his presence against a close associate by killing the perceived offender.

Martin Flores testified as a gang expert for the defense. According to Flores, a person who socialized with gang members was not necessarily an associate of the gang. Rather, a gang associate was an individual who was actively involved in gang life, but was not a gang member. Flores opined that Elias was not an associate of Newhall 13 because she did not have documented ties to the gang, such as field information cards, photographs, or writings showing a gang affiliation. When presented with a hypothetical based on the shooting of Martinez, Flores opined that the shooting was a personal act and was not committed for the benefit of the gang. Flores noted that there was no indication that the victim made any disrespectful statements about the gang prior to the shooting or that the perpetrator identified his membership in the gang during the commission of the crime. Flores further testified that, as a general matter, gangs did not get involved in personal relationship issues, and that the mere possession of a firearm by a gang member would not, by itself, benefit the gang.

III. **Verdict and Sentencing**

At the conclusion of the trial, the jury found Trujillo guilty as charged on 11 of the 12 counts. Trujillo was found not guilty of the attempted robbery of Paige Kirk's car keys [count 14], but guilty of the lesser included offense of attempted petty theft. The

8

jury also made true findings on each of the gang enhancement, firearm enhancement, and prior conviction allegations. Following the verdict, the trial court sentenced Trujillo to an aggregate term of 55 years to life in state prison. Trujillo filed a timely notice of appeal.

## DISCUSSION

### I.    Revocation of Trujillo's In Propria Persona Status

Trujillo first argues that the trial court violated his Sixth Amendment right of self-representation when it revoked his in propria persona status prior to trial. Trujillo asserts that the trial court applied the incorrect legal standard by relying solely on his out-of-court conduct as the basis for revoking his self-represented status, and that his in-court conduct was not sufficiently serious or obstructionist to support the revocation decision.

### A.    Relevant Background

On March 15, 2013, in an appearance before Los Angeles County Superior Court Judge Daniel B. Feldstern, Trujillo made a request to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). He expressed that he wanted to exercise his *Faretta* rights because of a conflict of interest with appointed counsel. After conducting a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), the trial court provided Trujillo with a *Faretta* waiver form, which he read and signed. As the court was orally reviewing the admonitions and waivers, however, Trujillo indicated that he might want to request new counsel. Following a further discussion with the court about his options, Trujillo decided not to exercise his *Faretta* rights and to instead be represented by a new appointed attorney, Michael Morse.

On February 27, 2014, Trujillo made a second request to represent himself. After advising Trujillo of the risks of self-representation, the trial court noted that Trujillo had several disciplinary issues since the beginning of the case, which could limit his in propria persona privileges while in custody. Trujillo confirmed that he still wanted to represent himself. The court then provided Trujillo with another *Faretta* waiver form, which he read and signed. While reviewing the signed waiver form, the court noted that Trujillo had six prior violations of the rules and regulations in county jail: (1) on

9

July 16, 2012, Trujillo was disciplined for possession of a metal eyeglass frame and latex gloves; (2) on October 22, 2012, Trujillo was disciplined for insubordination; (3) on October 28, 2012, Trujillo was disciplined for participating in a race riot and refusing to follow orders; (4) on January 5, 2013, Trujillo was disciplined for fighting with other inmates; (5) on February 20, 2013, Trujillo was again disciplined for fighting; and (6) on February 25, 2014, Trujillo failed to follow the instructions of the bailiffs and resisted their commands while being brought to court for a pretrial hearing.  The court also noted that, during the February 25, 2014 incident, Trujillo was "hostile and uncooperative and delayed proceedings in [the] court of not just [his] own case, but all of [the court's] calendar."  The court warned Trujillo that, if his *Faretta* request were granted, any further incidents of misconduct in jail or the courthouse could result in a revocation of his in propria persona privileges and status.  Trujillo acknowledged that he understood that his *Faretta* rights could be revoked due to misconduct.  After reviewing the admonitions and waivers with Trujillo, the court granted his request to represent himself and appointed Morse to serve as standby counsel.  The court also granted a 60-day continuance to allow Trujillo additional time to prepare for trial.

On March 13, 2014, the case was transferred to Los Angeles County Superior Court Judge David B. Gelfound.  During a discussion of a pretrial motion, the trial court instructed Trujillo not to interrupt the court and to conduct himself in an appropriate manner.  The prosecutor noted that Trujillo had several incidents of misconduct while in custody, including a prior act of disobedience in another courtroom.  The court stated that it was aware of Trujillo's history and that any further acts of misconduct could result in a termination of his *Faretta* rights.  On April 9, 2014, during an ex parte hearing, the court again admonished Trujillo not to interrupt and to conduct himself in a professional manner.  During a pretrial hearing held on April 24, 2014, the court had to instruct Trujillo three times not to interrupt.  The court also warned Trujillo that if he did not comply with its order, it would consider revoking his in propria persona status.  During a May 9, 2014 pretrial hearing, the court repeatedly admonished Trujillo about interrupting.  At one point, the court noted that Trujillo was raising his voice and that his inappropriate

10

conduct could result in his self-represented status being revoked. Following a fourth interruption, the court stated: "Again, Mr. Trujillo, you are speaking over me. You've interrupted me again. I believe that is the fourth time today you are interrupting me. You are speaking over the court. Again, you've done it repeatedly. Again, sir, I warned you a number of times that any continued interruptions will result in revocation of your pro per status, sir. At this point I'm warning you, this may be your last warning. I'll revoke your pro per stat[u]s if you continue to do that."

On June 3, 2014, the trial court informed the parties that it had received correspondence from the county jail indicating that Trujillo's in propria persona privileges had been revoked following a May 16, 2014 assault on another inmate. The court noted that Trujillo had a number of disciplinary issues prior to his *Faretta* request being granted, and that he had been warned that any disruptive conduct inside or outside the courtroom would result in a revocation of his self-represented status. The court also noted that, during the proceedings held in its courtroom, Trujillo repeatedly had interrupted the court in a disruptive manner, including the most recent court appearance where he engaged in multiple instances of disruptive conduct. The court then stated: "In light of the defendant's misconduct out of court and his disruptive nature, the court is revoking his pro per status relying on . . . case law including *People [v.] Carson* [(2005) 35 Cal.4th 1]. . . . [T]he court can rely on misconduct out of court to revoke a pro per status, and in this case . . . [the] defendant was warned multiple times. He continues to engage in disruptive conduct outside of the courtroom and therefore his pro per status is going to be revoked at this time."

On June 23, 2014, Trujillo asked the trial court to reinstate his *Faretta* rights. The court denied the request, noting that Trujillo was "granted pro per status under certain conditions" and such status was revoked "due to [his] disruptive nature."

## B.     Relevant Law

A criminal defendant has a right to represent himself or herself at trial under the Sixth Amendment to the United States Constitution. (*Faretta*, *supra*, 422 U.S. at p. 806;

11

*People v. Williams* (2013) 58 Cal.4th 197, 252.) "'A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers.' [Citation.]" (*Id.* at pp. 252-253.) The erroneous denial of a *Faretta* request is reversible per se, and the same standard applies to the erroneous revocation of in propria persona status. (*People v. Butler* (2009) 47 Cal.4th 814, 824-825.) "However, the right of self-representation is not absolute. '[The] government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' [Citation.] 'The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.' [Citations.]" (*People v. Williams*, *supra*, at p. 253.)

A trial court may terminate a defendant's right of self-representation for misconduct that "seriously threatens the core integrity of the trial," regardless of whether the misconduct occurs inside or outside the courtroom. (*People v. Carson* (2005) 35 Cal.4th 1, 6.) As our Supreme Court has observed, "opportunities to abuse the right of self-representation and engage in obstructionist conduct are not restricted to the courtroom. [Citation.] . . . Ultimately, the effect, not the location, of the misconduct and its impact on the core integrity of the trial will determine whether termination is warranted." (*Id.* at p. 9.) In deciding whether to revoke a defendant's right of self-representation, the trial court should consider several factors. In addition to "the nature of the misconduct and its impact on the trial proceedings," the court should consider "the availability and suitability of alternative sanctions" and "whether the defendant has been warned that particular misconduct will result in termination of in propria persona status." (*Id.* at p. 10.) "[W]hether the defendant has 'intentionally sought to disrupt and delay his trial'" is also a relevant consideration; however, "the relevance inheres in the effect of the misconduct on the trial proceedings, not the defendant's purpose." (*Id.* at pp. 10, 11.) While "[e]ach case must be evaluated in its own context, on its own facts," whenever "'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a

12

trial' [citation] or to compromise the court's ability to conduct a fair trial [citation], the defendant's *Faretta* rights are subject to forfeiture." (*Id.* at p. 10.)

We review a trial court's decision to revoke a defendant's in propria persona status for an abuse of discretion. (*People v. Carson*, *supra*, 35 Cal.4th at p. 12.) We "accord due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination of *Faretta* rights is necessary to maintain the fairness of the proceedings." (*Ibid.*) "'The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion "will not be disturbed in the absence of a strong showing of clear abuse."'" [Citation.]" (*People v. Williams*, *supra*, 58 Cal.4th at p. 253.)

### C.     The Trial Court Did Not Abuse Its Discretion In Revoking Trujillo's Right of Self-Representation

Trujillo argues that the trial court applied the incorrect legal standard in revoking his in propria persona status by basing the revocation solely on his out-of-court conduct without considering the impact of such conduct on the trial proceedings. The record does not support this assertion. Rather, a careful review of the trial court's ruling shows that the court did not rely solely on Trujillo's out-of-court misconduct as the basis for the revocation, but also considered his "disruptive nature" inside the courtroom in deciding to terminate his self-represented status. In particular, the trial court noted that there were multiple instances of Trujillo "interrupting the court in a disruptive nature," including his most recent court appearance where Trujillo repeatedly engaged in "disruptive conduct." The court further noted that Trujillo had been warned on multiple occasions that "any disruptive conduct in and outside the courtroom would result in the revocation of his pro per status," and that notwithstanding these express admonitions, Trujillo had continued to engage in misconduct both in jail and in court. In issuing its ruling, the court also cited to the California Supreme Court decision in *People v. Carson*, *supra*, 35 Cal.4th at p. 6, which set forth the governing rule of law that "[r]egardless of where it occurs, a court

13

may order termination for misconduct that seriously threatens the core integrity of the trial." Thus, contrary to Trujillo's claim, the record reflects that the trial court applied the correct legal standard in making the revocation decision.

Trujillo also asserts that the trial court abused its discretion in revoking his in propria persona status because his behavior did not constitute serious or obstructionist misconduct that warranted the termination of his *Faretta* rights. We see no abuse of discretion in the trial court's decision. At the time Trujillo's *Faretta* request was granted, he had a history of serious and violent misconduct while in custody, including an incident where he failed to follow the bailiffs' instructions and resisted their attempts to restrain him while in court for a pretrial hearing. In granting the *Faretta* request, the trial court warned Trujillo that any further incidents of misconduct inside or outside the courtroom could result in the revocation of his in propria persona privileges and status. At each of the next four pretrial hearings, Trujillo engaged in disruptive behavior, and the trial court repeatedly had to instruct him not to interrupt and to conduct himself in an appropriate manner. Indeed, at the May 9, 2014 hearing, the court admonished Trujillo four separate times about his failure to abide by courtroom protocol and reiterated its prior warnings that any further misconduct could result in his self-represented status being revoked. Less than a month later, Trujillo assaulted a fellow inmate, leading to the loss of his in propria persona privileges in county jail. On appeal, Trujillo tries to characterize his in-court misconduct as mere interruptions that were not intentionally obstructive. However, our Supreme Court has cautioned that "the extent of a defendant's disruptive behavior may not be fully evident from the cold record, and . . . one reason for according deference to the trial court is that it is in the best position to judge defendant's demeanor." (*People v. Welch* (1999) 20 Cal.4th 701, 735.) Here, the trial court had ample opportunity to observe Trujillo's behavior and reasonably could have found that his pattern of engaging in disruptive conduct both in and out of court threatened the core integrity of the trial proceedings. On this record, the trial court did not abuse its discretion in concluding that Trujillo had forfeited the right to continued self-representation.

14

## II. Admission of Paige Kirk's Preliminary Hearing Testimony

Trujillo next contends that the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted the preliminary hearing testimony of Paige Kirk at trial. Trujillo specifically claims that Kirk was not an unavailable witness within the meaning of Evidence Code sections 1291 and 240 because the prosecution failed to take reasonable steps to secure Kirk's presence at trial.

### A. Relevant Background

Kirk testified at the preliminary hearing on November 2, 2012, and the case was called for trial on August 12, 2014. On August 14, 2014, the trial court held a due diligence hearing to determine whether Kirk was unavailable as a witness. Lori Prickett, a senior district attorney investigator, and Detective Dorman, the lead detective on the case, testified for the prosecution about the efforts to locate Kirk.

On July 21, 2014, the district attorney's office sent a subpoena to Kirk at her last known address in Canyon Country. On August 5, 2014, Prickett received a subpoena for Kirk for an August 8, 2014 court appearance. After searching multiple databases, Prickett determined that the Canyon County address contained in the subpoena was current. On August 5, 2014, Prickett went to that address and spoke with Kirk's father, Steve. He said that Kirk was not at that location and that she lived with her boyfriend, Frank, somewhere in North Hollywood. He also said that he did not have an address for Kirk's boyfriend, had never been to his home, and did not know his last name. Steve told Prickett that Kirk had severe emotional issues that had been triggered by the case, and that Kirk did not want to testify at trial. He also told Prickett that Kirk was unemployed. Prickett left the subpoena and her contact information with Steve and asked him to have Kirk call her. Steve provided Prickett with Kirk's cell phone number, a description of her vehicle, and her grandparents' contact information. That same day, Prickett called Kirk's cell phone and spoke with an unidentified man, who said that he would have Kirk call Prickett back. Kirk, however, did not return the call.

15

On August 5, 2014, the prosecutor also spoke with Steve regarding Kirk's whereabouts. Steve said that he was trying to get Kirk to testify, but that she had mental health issues. He suggested that Kirk might be receptive to receiving text messages from Prickett. On August 5 or 6, 2014, Kirk called the prosecutor. When the prosecutor asked her for a current address and telephone number, Kirk responded that she was using another person's cell phone and would call again after ascertaining that cell phone number. Kirk then hung up, but did not call the prosecutor back.

On August 6, 2014, Prickett again called Kirk's cell phone, but no one answered. Prickett was unable to leave a message because the cell phone had not been set up for voicemail. Prickett also talked to Steve again that day. He said that his wife had spoken to Kirk and that Kirk had indicated she was not willing to testify. After searching a law enforcement database for Kirk's vehicle, Prickett determined that the vehicle had been seen at a location in the North Hollywood area on July 17, 2014. Prickett went to that location on August 6, but did not find Kirk's vehicle. Prickett's partner drove to Steve's house that same day, but also did not find Kirk's vehicle.

On August 7, 2014, Prickett sent a text message to Kirk's cell phone, informing Kirk that she was attempting to serve a subpoena to appear in court. Kirk did not respond to the text message. That same day, Prickett's partner drove to the address where Kirk's grandparents lived, but did not see Kirk's vehicle. On August 9, 2014, Detective Dorman drove by Steve's house and did not see Kirk's vehicle. On August 11, 2014, Prickett again tried to reach Kirk by calling her cell phone and sending her a text message. Kirk did not respond to these communications. Prickett also searched inmate databases and called several hospitals, but was unable to find Kirk.

After reviewing the efforts made by the prosecution to locate Kirk, the trial court stated: "Clearly -- leads were followed. But when a person clearly has expressly stated that they do not want to come to court and they are actively hiding and evading service, despite the best efforts of law enforcement to find her, I believe that pursuant to case law, reasonable and/or due diligence was, in fact, used by law enforcement and I am prepared to make a finding that she is unavailable." The court thereafter ruled that Kirk was

16

unavailable as a witness under Evidence Code section 240, and that there had been a full and fair opportunity for the defense to cross-examine Kirk at the preliminary hearing.  In accordance with this ruling, the court permitted the transcript of Kirk's preliminary hearing testimony to be read to the jury.

> **B.      Relevant Law**

A criminal defendant has a right under both the federal and state Constitutions to confront witnesses.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  "The right of confrontation is not absolute, however, and may 'in appropriate cases' bow to other legitimate interests in the criminal trial process.  [Citations.]"  (*People v. Carter* (2005) 36 Cal.4th 1114, 1172.)  Specifically, "[i]f a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial."  (*People v. Smith* (2003) 30 Cal.4th 581, 609, citing *Barber v. Page* (1968) 390 U.S. 719.)  The Unites States Supreme Court confirmed the limitation on the use of an unavailable witness in *Crawford v. Washington* (2004) 541 U.S. 36, recognizing that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  (*Id*. at p. 59.)

In California, Evidence Code section 1291 codifies this traditional exception to the right of confrontation.  It provides, in relevant part, that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (Evid. Code, § 1291, subd. (a).)  The California Supreme Court has recognized that "[t]he constitutional and statutory requirements are 'in harmony.'"  (*People v. Smith*, *supra*, 30 Cal.4th at p. 609.)  "[W]hen the requirements of [Evidence Code] section 1291

are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation." (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

Under Evidence Code section 240, a declarant is "unavailable as a witness" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "The term '[r]easonable diligence, often called "due diligence" in case law, "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'"'" [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*People v. Herrera*, *supra*, 49 Cal.4th at p. 622.) "[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*Id.* at p. 623.) Where the relevant facts are undisputed, we independently review a trial court's determination of due diligence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675.)

## C. The Trial Court Did Not Err In Admitting Kirk's Preliminary Hearing Testimony

Trujillo contends that the trial court should have excluded Kirk's preliminary hearing testimony because the prosecution failed to establish that it made a reasonable and timely effort to secure Kirk's appearance at trial. Based on our independent review of the record, however, we conclude that the trial court did not err in determining that the prosecution had satisfied its burden of showing due diligence.

The record reflects that the district attorney's office engaged in multiple efforts to locate Kirk. Prickett and other investigators visited Kirk's last known address three times, and Pricket spoke with Kirk's father two times to try to ascertain her current whereabouts. The investigators also went to the address of Kirk's grandparents and the address where Kirk's vehicle was last seen by law enforcement, but were unable to find her. Prickett repeatedly called Kirk's cell phone and sent her text messages about her

18

court appearance without receiving a response. Prickett also searched vehicle and inmate databases and contacted several area hospitals, but could not locate Kirk. Kirk's father, who appeared to be cooperative, conveyed to both Prickett and the prosecutor that Kirk did not want to testify because she was experiencing severe emotional distress due to the case, suggesting that Kirk may have been actively avoiding service. Under these circumstances, it appears unlikely that Kirk would have cooperated with other additional efforts that could have been made to secure her presence at trial, even if such efforts had begun earlier. (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 706 [prosecution showed due diligence in trying to secure a witness's presence at trial, in part, because "it is fairly clear [the witness] purposefully made herself unavailable"].) The prosecution's efforts to locate Kirk, although not exhaustive, demonstrated reasonable diligence.

Trujillo nevertheless claims that the prosecution should have taken additional steps to locate Kirk, such as staking out her parents' residence, contacting other relatives who might have known her whereabouts, and asking Kirk's father to arrange for Kirk to call the investigator the next time he saw her. However, the record shows that Kirk's father did encourage Kirk to contact the investigator as well as to testify at trial, but she was unwilling to do so because of her emotional health issues. The record also shows that, after the investigator spoke with Kirk's father and left the subpoena with him, Kirk contacted the prosecutor directly, but refused to provide a current address or telephone number, and then failed to follow through with a return call. In any event, where, as here, the record demonstrates that the prosecution exercised reasonable diligence to secure a witness's presence at trial, "the circumstance that 'additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' [Citations.]" (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 677.) Because the prosecution exercised reasonable diligence in attempting to locate Kirk, the trial court did not err in concluding that Kirk was an unavailable witness within the meaning of Evidence Code sections 1291 and 240.

**III. Admission of Navarro's Trial Testimony and Out-of-Court Statements**

On appeal, Trujillo also challenges the admission of Juan Navarro's trial testimony and out-of-court statements to the police. Trujillo argues that Navarro should not have been permitted to testify at trial because he was not properly sworn as a witness under Evidence Code section 710. Trujillo further asserts that Navarro's statements to the police were inadmissible because they did not qualify as prior inconsistent statements under Evidence Code section 1235, and Trujillo did not have a meaningful opportunity to cross-examine Navarro in violation of the constitutional right of confrontation.

**A.      Relevant Background**

The prosecution called Juan Navarro to testify as a witness at trial. Navarro was in custody at the time of trial but had not been charged in this case. The record of the trial proceedings reflects that, after Navarro took the stand, the following exchange occurred:

The Court:  Thank you.  All right.  Mr. Navarro is present in court on the witness stand.  Mr. Navarro, raise your right hand, please.

The Witness:  It's only this far, though.

The Court:  Raise your right hand.  His hand is raised.  Swear him in.  Go ahead.

The Witness:  I plead the Fifth.

The Court:  Raise your right hand.

The Clerk:  Do you solemnly state, under the penalty of perjury, that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth and nothing but the truth?

The Witness:  (No audible response.)

The Court:  You are sitting there.  Answer his question first and we'll deal with that.  You have just taken an oath.  Do you understand that?  Yes or no.

The Witness:  Yeah.  I guess.

The Court:  Thank you.  You can put your hand down.

The prosecutor commenced his direct examination.  In response to the first question, Navarro again stated that he was pleading "the Fifth."  The trial court advised

20

Navarro that the Fifth Amendment privilege did not apply because he was not incriminating himself. Navarro then admitted on direct examination that his mother resided on Race Street, that he was affiliated with the Newhall 13 gang, and that he had Newhall 13 gang tattoos. He also admitted that he had been a member of the gang since he was 18 years old and that other people called him "Peenut." Navarro denied that he knew either Trujillo or Martinez, denied that Martinez had given him a ride to his mother's house, and denied that he was ever interviewed by any detectives about a shooting. Navarro further denied telling any detectives that he had witnessed the shooting of Martinez or that "Temper" was the person who had shot Martinez. Detectives Dorman and Burrow thereafter testified about the statements that Navarro made about the shooting when they interviewed him, including identifying Trujillo as the shooter.

**B.      The Trial Court Did Not Err In Admitting Navarro's Trial Testimony**

Trujillo contends that Navarro's trial testimony was unsworn and inadmissible because Navarro was not properly administered an oath prior to testifying. Evidence Code section 710 provides that every witness over the age of 10 who is competent "shall take an oath or make an affirmation or declaration in the form provided by law." Trujillo, however, did not object at trial to the alleged failure to administer the oath to Navarro. As our Supreme Court long ago held, "if defendant was unsatisfied with the adequacy of the oath-taking, he should have called the matter to the attention of the court. Any shortcomings in the procedure were waived . . . by failure to object. . . ." (*People v. Thomas* (1967) 65 Cal.2d 698, 708; see also *People v. Carreon* (1984) 151 Cal.App.3d 559, 579 ["if a witness is permitted to testify without having taken the appropriate oath, the defect must be timely noted and failure to do so constitutes a waiver"]; *People v. Haberlin* (1969) 272 Cal.App.2d 711, 716 [an objection to oath-taking "must be raised in the proceeding where the witness is testifying and at a time when the defect can be easily remedied"].) Because Trujillo did not raise a timely objection in the trial court to the adequacy of the oath administered to Navarro, the issue has been forfeited on appeal.

21

Even assuming Trujillo's claim of error had not been forfeited, it would fail on the merits. "Where there is no evidence in the record that a witness has been sworn, an appellate court 'must assume the officer performed his duty and that the witnesses were sworn. The burden is on the appellant to show, on appeal, that the witnesses were not sworn.' [Citations.]" (*People v. Carreon*, *supra*, 151 Cal.App.3d at p. 579.) The record reflects that, after taking the witness stand, Navarro raised his right hand while the oath was read to him. There is no indication that Navarro expressly refused to take the oath at that time. Rather, the reporter's transcript indicates there was "[n]o audible response." Immediately thereafter, however, the trial court stated to Navarro, "You have just taken an oath. Do you understand that? Yes or no." Navarro replied, "Yeah, I guess." The trial court's statement that Navarro had "just taken an oath," and Navarro's response that he understood he had done so, reasonably support a finding that the oath was administered to Navarro prior to his testimony. On this record, Trujillo has failed to affirmatively show that Navarro's trial testimony was unsworn. We accordingly conclude that the trial court did not err in allowing Navarro to testify.[3]

## C. The Trial Court Did Not Err In Admitting Navarro's Out-of-Court Statements

Trujillo also claims that the trial court erred in admitting evidence of Navarro's out-of-court statements to the police as prior inconsistent statements under Evidence Code section 1235. Trujillo specifically asserts that Navarro's responses of "no" and "I don't know" to many of the prosecutor's questions were tantamount to a refusal to testify, and thus, Navarro did not provide any testimony at trial that was inconsistent with his prior statements to the police. Trujillo also argues that Navarro's refusal to answer the prosecutor's questions in a meaningful manner denied Trujillo an opportunity to cross-

---

[3] In light of our conclusion that the trial court did not err in admitting Navarro's trial testimony, we need not address Trujillo's argument that he received ineffective assistance of counsel because his trial attorney failed to object to the oath-taking procedure prior to Navarro testifying.

22

examine Navarro about his out-of-court statements in violation of the constitutional right of confrontation. We conclude, however, that Trujillo's claim lacks merit.

Evidence Code section 1235 provides that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 states that "[u]nless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness has not been excused from giving further testimony in the action." As our Supreme Court has explained, "'"[t]he 'fundamental requirement' of section 1235 is that the statement in fact be inconsistent with the witness's trial testimony." [Citation.] "'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement … .'" [Citation.]' [Citation.] . . . [U]nder the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeachment under Evidence Code section 1235. [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 859.) A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. (*Ibid*.)

Here, Navarro's trial testimony about the shooting of Martinez directly contradicted his prior statements to the police. At trial, Navarro denied knowing either Trujillo or Martinez, denied witnessing the shooting of Martinez, and denied ever being interviewed by any detectives about the shooting. He specifically denied telling any detective that he was friends with Martinez, that he was present when Martinez was shot, and that Temper was the person who shot Martinez. In contrast, during his interview with Detectives Dorman and Burrows, Navarro recounted that he was friends with Martinez, that Martinez had given him a ride to his mother's house, and that he had witnessed Martinez being shot as Martinez was driving away in his truck. During the interview, Navarro also identified Trujillo as the shooter, telling the detectives, "I don't know why Temper shot him. That fucker is crazy. It's fucked up, what he did." Because

23

Navarro's trial testimony about the shooting was materially inconsistent with his police interview, the trial court did not abuse its discretion in admitting the evidence of Navarro's prior statements to the police under Evidence Code section 1235.

We likewise reject Trujillo's claim that the admission of Navarro's statements to the police deprived Trujillo of his constitutional right of confrontation. "'"The receipt in evidence of a prior inconsistent statement does not violate the confrontation clauses of the federal and state Constitutions where the declarant testifies at trial and is subject to cross-examination."'" [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1006.) Here, Navarro was called as a witness by the prosecution, answered questions on direct examination, and was available for cross-examination. While Navarro's denial of his prior statements to the police "'narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.'" (*People v. Homick*, *supra*, 55 Cal.4th at p. 861; see also *People v. Richardson*, *supra*, at p. 1006 [no confrontation clause violation where the declarant "testified at trial and 'when given an opportunity to explain or deny [his] statements, … denied that he made them'"].)

For these reasons, Trujillo's reliance on *People v. Rios* (1985) 163 Cal.App.3d 852 (*Rios*) to support his argument is misplaced. In *Rios*, the trial court admitted evidence of two witnesses' prior statements to the police after each witness refused to answer any questions when called to testify at trial. The appellate court concluded that the out-of-court statements were not admissible as prior inconsistent statements under Evidence Code section 1235 because the witnesses' refusal to provide any testimony meant that there was "simply no 'statement' in the record which is inconsistent . . . with prior statements." (*Id*. at p. 864.) The appellate court further concluded that the admission of the witnesses' prior statements to the police violated the defendant's constitutional right of confrontation because "there was no opportunity to contemporaneously cross-examine when the prior statements were made or the ability to meaningfully cross-examine [the witnesses] at trial." (*Id*. at p. 865.) In this case, however, Navarro testified at trial.

24

Although he initially attempted to "plead the Fifth" when called to the witness stand, he thereafter answered the prosecutor's questions. During his testimony, Navarro admitted that his mother resided on Race Street (the location where the shooting occurred), that he had gang tattoos, and that he had been a member of the Newhall 13 gang since he was 18 years old. While Navarro denied making any prior statements to the police about the shooting, he did not refuse to provide any testimony whatsoever. (See *People v. Richardson*, *supra*, 43 Cal.4th at p. 1006 [distinguishing holding in *Rios* as applying only to situations where the witness refuses to answer any questions]; *People v. Homick*, *supra*, 55 Cal.4th at p. 860 [same].) Under these circumstances, the trial court did not err in admitting evidence of Navarro's prior inconsistent statements to the police.

## IV.    Sufficiency of the Evidence on the Convictions

Trujillo contends that the evidence was insufficient to support his convictions for false imprisonment [count 4], second degree robbery [count 5], and criminal threats [count 6]. Each of these counts arose out of the January 23, 2012 incident involving Paige Kirk.

### A.    Standard of Review

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.]

A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### B. False Imprisonment [Count 4]

Trujillo was convicted on count 4 of false imprisonment of Kirk by violence or menace in violation of section 236. On appeal, Trujillo argues this conviction must be reversed because the evidence was insufficient to support a finding that he intentionally confined Kirk by violence or menace, or made Kirk go anywhere against her will.

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) False imprisonment is a felony if it is "effected by violence, menace, fraud, or deceit." (§ 237, subd. (a).) "'Violence' . . . means the exercise of physical force 'greater than that reasonably necessary to effect the restraint.' [Citations.]" (*People v. Newman* (2015) 238 Cal.App.4th 103, 108.) "'Menace is a threat of harm express or implied by words or act. [Citations.]' [Citation.]" (*People v. Islas* (2012) 210 Cal.App.4th 116, 123.) "When a rational fact finder could conclude that a defendant's acts or words expressly or impliedly threatened harm, the fact finder may find that there is menace sufficient to make false imprisonment a felony. An express threat or use of a deadly weapon is not necessary." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1491; see also *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513 [sufficient evidence of felony false imprisonment where defendant displayed no weapon, but verbally threatened to "'do something'" to victims if they did not comply]; *People v. Castro* (2006) 138 Cal.App.4th 137, 143 [sufficient evidence of felony false imprisonment where defendant grabbed victim's arm and pulled her to him but did not make any verbal threats or display any weapons].) The trier of fact "properly may consider a victim's fear" in deciding whether there has been an express or implied threat of harm. (*People v. Islas*, *supra*, at p. 127.)

In this case, the evidence was sufficient to support a finding that Trujillo falsely imprisoned Kirk by menace when he confined her to her car and compelled her to drive

him around town. Kirk, who aware that Trujillo was a member of the Newhall 13 gang based on his numerous gang tattoos, agreed to give him a ride as a favor. When Kirk went to pick up Trujillo, he was accompanied by two women who acted in a threatening manner. One of the women displayed a blade. Because of the presence of a weapon, Kirk felt afraid as Trujillo and the woman who identified herself as Maria got into her car and told her to drive them to various places. When Kirk later drove Trujillo and Maria back to the original location, Maria took Kirk's cell phone from her. As Kirk continued driving Trujillo from place to place, she repeatedly told him to get out of her car, but he refused and became infuriated with her. When Kirk stopped at a location in Newhall, Trujillo tried to keep her from leaving by taking her keys from the ignition, and Kirk had to physically struggle with Trujillo to retrieve her keys.

Although Trujillo never expressly threatened to harm Kirk if she did not drive him in her car, Kirk testified that she was fearful throughout the entire incident because she did not know "who ended up with the blade." Kirk also testified that she felt she had to drive Trujillo to various locations that night and that she might get hurt if she refused. It is true that Kirk indicated on cross-examination that she "willingly" or "voluntarily" drove Trujillo from place to place because he asked her to do so. However, Kirk stated on redirect that she did not feel like she was driving Trujillo voluntarily, but rather did so because she was afraid of being harmed. While there were some inconsistencies in Kirk's testimony, such conflicts in the evidence were to be resolved by the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 ["[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].) Based on the totality of the evidence, the jury reasonably could have found that Trujillo created an intimidating situation and used an implied threat of harm to force Kirk to drive him around against her will. Trujillo's conviction for felony false imprisonment was supported by substantial evidence.

27

## C.    Second Degree Robbery [Count 5]

Trujillo was convicted on count 5 of second degree robbery against Kirk in violation of section 211. The prosecution's theory was that Trujillo committed a robbery when he took Kirk's vehicle registration from her glove compartment. Trujillo contends on appeal that this conviction was not supported by substantial evidence because the prosecution failed to prove that he took the vehicle registration by means of force or fear.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The California Supreme Court has described the crime of robbery as "larceny with the aggravating circumstances that 'the property is taken from the person or presence of another …' and 'is accomplished by the use of force or by putting the victim in fear of injury.' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) "Robbery may be accomplished when fear prevents a victim from retaining possession of property within her reach that she could have retained absent the robber's intercession. [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 240.) "If the other elements are satisfied, the crime of robbery is complete without regard to the value of the property taken. [Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)

Here, the evidence was sufficient to support a finding that Trujillo employed force or fear to take Kirk's property from her immediate presence. Kirk testified that, after she struggled with Trujillo to retrieve her keys, he took her vehicle registration from the glove compartment and warned her that he knew where she lived. Kirk was scared of Trujillo as they struggled over her keys, and she continued to fear him when he took her registration. She also felt Trujillo was threatening to harm her when he told her that he knew where she lived. Although Kirk stated at one point in her testimony that she "didn't care" about getting her registration back from Trujillo, she then clarified that she did not try to retrieve the registration because Trujillo "was outside of the car" and she "just wanted to leave and get out of there at the time." Kirk further stated that she was still shaken up and in fear of Trujillo as she was driving home. On this record, there was substantial evidence to support Trujillo's second degree robbery conviction.

28

## D.    Criminal Threats [Count 6]

Trujillo was convicted on count 6 of criminal threats against Kirk in violation of section 422.  On appeal, Trujillo asserts this conviction must be reversed because there was no evidence that he ever threatened to kill or cause great bodily harm to Kirk, or that his statement to Kirk that "I know where you live" was so unequivocal, unconditional, immediate and specific as to constitute a criminal threat.

To prove a criminal threat offense under section 422, the prosecution must establish that "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances.  [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

With respect to the requirement that a threat be "'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat,'" the California Supreme Court has explained that "'"unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances … ."'  [Citation.] 'The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim.'" (*In re George T.* (2004) 33 Cal.4th 620, 635.)  Section 422's use of the word "unconditional," for instance, "'was not meant to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity

of purpose and imminent prospect of execution.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 339.)

"A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]" (*In re George T.*, *supra*, 33 Cal.4th at p. 635; see also *People v. Butler* (2000) 85 Cal.App.4th 745, 753 ["it is the circumstances under which the threat is made that give meaning to the actual words used"]; *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218 ["the meaning of the threat by defendant must be gleaned from the words and all of the surrounding circumstances"].) "In determining whether conditional, vague, or ambiguous language constitutes a violation of section 422, the trier of fact may consider 'the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant. [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 808.) "A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution[;] section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler*, *supra*, at p. 752.) Section 422 also "'does not concentrate on the precise words of the threat. Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat.'" (*People v. Wilson*, *supra*, at p. 807.)

Viewed in the light most favorable to the jury's verdict, the evidence in this case was sufficient to support a finding that Trujillo made a criminal threat against Kirk when he took her vehicle registration and told her "this is for my protection so I know where you live" and "if you tell anyone about tonight, I know where you live." The circumstances under which Trujillo made these statements is significant. At the time of the threat, Trujillo was a known Newhall 13 gang member with a history of violent behavior. Kirk was aware of Trujillo's membership in the gang from his prominent gang tattoos and his gang moniker, "Temper." In the hours preceding the threat, Trujillo falsely imprisoned Kirk in her car and forced her to drive him around town. Kirk felt that she had no choice but to comply because Trujillo's two female associates initially had approached her with a blade and acted in a threatening manner. Immediately after Kirk

30

engaged in a physical struggle with Trujillo over her car keys, Trujillo took Kirk's vehicle registration from the glove compartment and made the statements about knowing where she lived. Although Trujillo did not articulate a threat to commit a specific criminal act in making these statements or provide other details about his intent, the jury reasonably could have found that, based on the surrounding circumstances, Trujillo's words were sufficiently unequivocal, unconditional, immediate and specific to convey to Kirk a gravity of purpose and immediate prospect of death or serious bodily injury. (See, e.g., *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340-1342 [upholding criminal threats conviction where defendant, a Happy Town gang member, told victim "'you fucked up my brother's testimony. I'm going to talk to some guys from Happy Town"]; *People v. Butler*, *supra*, 85 Cal.App.4th at pp. 753-755 [upholding criminal threats conviction where defendant, a known gang member, told victim that she needed to mind her own business or she "'was going to get hurt'"].)

Kirk confirmed in her testimony that she understood Trujillo's statements to be a threat of serious physical harm, which caused her to fear for her and her family's safety. In particular, Kirk testified that, based on Trujillo's statements and his gang affiliation, she was afraid that he might "come after" her and physically "hurt" her, and that calling the police would place her and her family in jeopardy. While Kirk acknowledged that Trujillo never said the words "I'm going to kill you right now" or "I'm going to hurt you" in making the threat, she indicated that she perceived his statements as a threat of immediate violence. Kirk also explained that she experienced a sense of fear throughout the incident, including the time she spent alone with Trujillo, because she did not know who had the blade that she had seen earlier. The evidence further showed that Kirk was still frightened and visibly shaken when she was interviewed by the police later that night, and that she remained in fear of Trujillo months after the incident. Based on the totality of the circumstances surrounding Trujillo's threat against Kirk, the evidence was sufficient to support his conviction for making criminal threats.

31

## V. Sufficiency of the Evidence on the Gang Enhancements

Trujillo also challenges the sufficiency of the evidence supporting the gang enhancement findings on the counts for attempted murder [count 1], carrying a loaded firearm in public [count 2], and possession of a firearm by a felon [count 3]. Trujillo claims that the evidence was insufficient to support the findings that he committed these crimes for the benefit of, at the direction of, or in association with a gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members.

### A. Relevant Law

To obtain a true finding on a gang enhancement allegation, the prosecution must prove that the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "[E]xpert testimony about gang culture and habits is the type of evidence a jury may rely on to reach . . . a finding on a gang allegation. [Citation.]" (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) "'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]'" (*People v. Ward* (2005) 36 Cal.4th 186, 209.) While a gang expert may not ordinarily testify whether the defendant committed a particular crime for the benefit of a gang, the expert "properly could . . . express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Indeed, "'[e]xpert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*Ibid.*) A jury's true finding on a gang enhancement is generally reviewed on appeal for substantial evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

**B.    The Gang Enhancements Were Supported by Substantial Evidence**

In this case, there was substantial evidence connecting Trujillo's shooting of Martinez to the Newhall 13 gang. The jury heard evidence that both Trujillo and Navarro were active members of the gang, and that Trujillo had prominent gang tattoos signifying his gang affiliation. Trujillo also acted as an enforcer for Newhall 13, and people who knew him personally described Trujillo as angry and crazy. Although Martinez's girlfriend, Elias, was not a known gang member at the time of the shooting, she was a close associate of Newhall 13 and often socialized with members of the gang at known gang hangouts. On the night of the shooting, Elias became angry at Martinez after he told her that he wanted to break up with her. During their ensuing argument, Elias saw Trujillo walking by on the street and called out to him, "Temper, Temper." A short time later, Navarro called Martinez and asked him for a ride to his house in Newhall, which was located in an area claimed by the Newhall 13 gang. Around the same time, Trujillo had his former girlfriend, Day, give him a ride to a location near Navarro's house, and after Trujillo got out of the car, Day sent a text message to Navarro to let him know Trujillo was headed his way. As Martinez was getting ready to drive away from Navarro's house, Trujillo approached and shot Martinez in the head. While there was no evidence that Trujillo called out gang names or threw gang signs, he committed the shooting in gang territory in front of a fellow gang member's house and against a victim who had just broken up with a known gang associate. From this evidence, the jury reasonably could have inferred that Trujillo, acting as an enforcer for Newhall 13, shot Martinez for publicly disrespecting Elias, a close associate of the gang.

The jury also heard expert opinion testimony that, based on a hypothetical drawn from the evidence in this case, the shooting would have been committed for the benefit of the Newhall 13 gang. Detective Dorman, the prosecution's gang expert, testified that an act of disrespect against a gang associate could be perceived as an act of disrespect against the gang, and that a gang enforcer might feel compelled to punish such an act by killing the perceived offender. Detective Dorman further testified that the commission of a violent crime such as a shooting would instill fear in the community, which would deter

33

residents from reporting gang-related crimes.  Such acts of violence also would serve to enhance the reputation of the gang and its members, and enable the gang to operate its criminal business with impunity.  (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 63 ["[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang'"].)  From this evidence, the jury reasonably could have found that the shooting of Martinez was committed for the benefit of, at the direction of, or in association with the Newhall 13 gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members.  The jury's true findings on the gang enhancements were supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


BLUMENFELD, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.